Laramore, Judge,
delivered the opinion of the court:
The plaintiff makes its claim under the War Contract Hardship Claims Act, popularly called the Lucas Act, 60 Stat. 902, 903, as amended by 62 Stat. 992, 41 U. S. C. § 106 note (1952 Ed.), to recover an alleged net loss of $43,238.93 sustained by the plaintiff in the performance of Government contracts between September 16, 1940, and August 14, 1945.
During the above period, the plaintiff, a corporation engaged in the operation of a mill at Manchester, New Hampshire, performed under 12 contracts with the Army Quartermaster Corps. Sis of the contracts, entered into between June 19, 1940, and April 1, 1941, contained a liquidated-damages clause under which the Government could withhold specified sums per day for each day the delivery of prescribed shipments of cloth under the contracts was late. The other six contracts entered into between February 5, 1942, and April 26,1943, did not contain liquidated-damages clauses and are not in any way subject to litigation in this suit. Pursuant to the liquidated-damages clause in the above contracts, liquidated damages were assessed by the Government against the plaintiff and withheld from payments made by the Government to the plaintiff.
The aforementioned damages clause also contained a provision that the contractor could obtain an extension in its date of delivery when the cause of a delay in delivery was due to unforeseeable causes beyond the control and without the fault or negligence of the contractor if the contractor notified the contracting officer in writing of the cause of the delay within 10 days from the beginning thereof.
Deliveries on contract number W 669 qm-10270 were first due on May 4,1941, but were not forthcoming. On May 6, 1941, the contracting officer, by letter, notified the plaintiff of the delinquency. Plaintiff answered by letter on May 12, 1941, indicating the causes of delay but not making a request for an extension of the time of delivery. On July 9, 1941, *56 however, the plaintiff did make such a request but it was later denied by the contracting officer on October 15, 1941, because the plaintiff did not make its request within the 10 days specified in the contract and because the causes assigned by it were not unforeseeable causes beyond the control and without the fault or negligence of the plaintiff. There is some question as to whether the plaintiff appealed from this decision within the 30 days specified therefor in the contract, but the record does reveal a letter by the plaintiff to the contracting officer giving notice of appeal on November 13,1941. The case was subsequently forwarded to the Quartermaster General in Washington with another more-detailed letter from the plaintiff dated December 11, 1941, which the contracting officer in its letter classified as the letter of appeal. The letter of November 13, 1941, was not mentioned to the Quartermaster General and was evidently not forwarded to him. The forwarding letter assigned an additional reason for refusing to grant relief to the plaintiff on appeal, it being that plaintiff did not file its appeal within the 30-day period specified in the contract. The letter of December 11, 1941, was evidently treated as an adequate appeal, however, and the Quartermaster General denied recovery to the plaintiff for only the first two causes mentioned above.
Upon the passage of the War Contract Hardship Claims Act, and pursuant thereto, the plaintiff on February 5,1947, sought remission of losses due to the assessments of the liquidated damages by request to the Quartermaster Purchasing Office, New York, N. Y. This claim was denied by the War Contract Hardship Claims Board on December 22,1949, upon the ground that no written request under the First War Powers Act had been made by plaintiff of the War Department. The Board, upon reconsideration, again denied plaintiff’s claim on February 16,1950.
Plaintiff filed its petition with this court on March 21,1950, requesting a remission of the liquidated damages assessed alleging that it is entitled to recovery because it meets the prerequisites of the act, to wit, it suffered an overall net loss on all its Government contracts, performance of which occurred within the period of September 16,1940, and August 14, 1945, and that such loss was not due to its own fault or *57 negligence. Plaintiff also avers that a proper written request for relief within the purview of section 3 of the Lucas Act was filed on behalf of plaintiff with the War Department of the United States prior to August 14, 1945, contrary to the decision of the War Contract Hardship Claims Board.
This court has jurisdiction to award recovery to claimants under the Lucas Act only in those cases where a proper request for relief was filed prior to August 14, 1945, pursuant to section 3 of that act.
Section 3 of the Lucas Act is as follows:
Claims for losses shall not be considered unless filed with the department or agency concerned within six months after the date of approval of this Act, and shall be limited to losses with, respect to which a written request for relief was filed with such department or agency on or before August 14-, 194-S, but a previous settlement under the First War Powers Act, .1941, or the Contract Settlement Act of 1944 shall not operate to preclude further relief otherwise allowable under this Act. [Emphasis added.]
The Supreme Court in Fogarty v. United States, 340 U. S. 8 (1950), has construed that section “to mean written notice presented prior to August 14, 1945, to an agency which was authorized to grant relief under § 201 of the First War Powers Act.” In that connection the Court therein went on to say at page 13:
* * * Since there is no definition of the term in the Act or regulations, and since the legislative history of the Act does not show that any settled usage of the term was brought to the attention of Congress, no particular form of notice is required. But whatever the form of notice, it must be sufficient to apprise the agency that it was being ashed to grant extra-legal relief under the First War Powers Act for losses sustained in the performance of war contracts. [Emphasis added.]
Thus, in order for a claimant in this court to recover for losses incurred in the performance of Government contracts between September 16, 1940, and August 14, 1945, it must show that it made a written request for extralegal relief with the department or agency concerned before August 14,1945.
This we think the plaintiff has not done in this case.
*58 In support of its contention that it did file a proper written request for extralegal relief the plaintiff points to the fact that this court on July 9, 1951, overruled, without opinion, the defendant’s motion of May 2,1951, to dismiss plaintiff’s petition on the ground that no proper request for relief had been filed. Raylaine Worsted Inc. v. United States, 119 C. C. Cls. 838. The plaintiff contends that notwithstanding the fact that no opinion was filed, the decision of a case is the court’s judgment thereon, its opinion being only a statement of the reasons on which the judgment rests. It argues, further, that since this issue was previously decided by the court it should not again be permitted to come into issue and that the court should apply the rule of the “law of the case.” Plaintiff cites 21 C.J.S. page 330 as the basis for its statement.
The defendant argues that, in the absence of any written opinion to the contrary, the court in overruling its motion did not decide plaintiff’s requests were proper but rather indicated a preference to withhold its definitive pronouncement on that issue until after trial when it could appraise the requests in the perspective of their background. In any event, the defendant states, it respectfully asks the court to reconsider its decision on defendant’s earlier motion.
The rule of “law of the case” relied upon by the plaintiff is not as inflexible a rule as the plaintiff would have it be. The general rule is that a decision by the court on a point in a case becomes the law of the case unless or until it is reversed or modified by a higher court. The rule does not stop there, however, and it is not inflexible. The rule does not constitute a limitation on the power of the court, which may disregard or correct a prior decision or ruling which was plainly wrong, or where the application of the law of the case rule would work a manifest injustice. It has been held that questions decided on a motion to dismiss an appeal become the law of the case, but that an improper ruling on such a motion does not preclude a disposition of the case on proper grounds on a hearing on the merits.
See also Whitfield v. Sears et al., 10 N. W. 2d 564; Star Bottling Co. v. Louisiana Purchase Exposition Co., 144 S. W. 776.
*59 It is the position of this court that the order it entered on July 9, 1951, overruling the defendant’s motion to dismiss, does not constitute the “law of the case” and does not preclude the court from now rendering a decision on whether or not a proper request for extralegal relief was filed by plaintiff before August 14,1945, after a hearing on the merits.
Plaintiff in its brief, to support its contention that a proper request for extralegal relief was made, urges that letters from H. E. Straw, President of The Amoskeag National Bank of Manchester, N. H., dated November 29,1941; from F. H. Burrell, President and General Manager of Leavitt Stores Corporation, dated December 12, 1941; and from Senator Styles Bridges, dated December 13,1941, which letters were all written to the Commanding General of the Philadelphia Quartermaster Depot on behalf of the plaintiff, constitute proper requests for extralegal relief as contemplated by the statute.
We believe these three letters were related to the appeal taken under the contract and, also, since they were not letters from the plaintiff they cannot be considered requests for extralegal relief. The plaintiff would have to make its own request or through its attorney. Nevertheless, the letters will be considered separately.
The letter from Mr. Straw on November 29, 1941, states in part as follows:
* * * Kaylaine Worsteds, Inc. deserves careful consideration of its petition because of its importance * * *. [Emphasis added.]
Further, in conclusion, the letter states:
* * * we make this statement in the hope that it may be helpful to you in your consideration of their 'petition. [Emphasis added.]
It is quite apparent that even if letters from others were considered proper requests for extralegal relief that the above letter could not be considered such. It is merely a request that the contracting officer give careful consideration to the petition on appeal already filed by the plaintiff wilder the contract.
*60 The letter of December 12, 1941, from Mr. Burrell, merely gives the background of the plaintiff’s mill and indicates that its (Leavitt Stores Corporation) primary interest in the entire affair is merely that of self-interest. Mr. Burrell wrote, in part, the following:
These fines have been a great hardship to the Company, as the operating statement will show. My principal interest is that being the President of the largest department store in the state, employing from two hundred and fifty to three hundred people, in order to be able to have that many employees, we must have industries going, as Manchester is composed mostly of working people in an industrial city that grew up around the former Amoskeag Company.
I hope, after investigation, you will give consideration to this company.
There is no request for extralegal relief here. It merely asks that the company be given consideration which it most certainly was given; twice by the contracting officer, once by the Quartermaster General, and twice by the Comptroller General. The letter must have been written at the instance of plaintiff in an effort to get a satisfactory determination of its then pending appeal.
The entire purpose and substance of Senator Bridges’ letter of December 13, 1941, can be shown by the following quotation:
* * * I am writing to inquire if, in view of the circumstances I have been informed governed the delay of deliveries against the contracts, some procedure can be followed by Raylaine Worsteds Incorporated by which the fines can be withdrawn or appreciably lowered and the Company allowed to continue its operations without this burden.
There is little doubt but that the letter had reference to the same matter covered by the plaintiff’s letter of December 11, 1941, discussed below, and was undoubtedly intended to aid the plaintiff in getting favorable consideration of the appeal. The reasons that Senator Bridges cited as causing the delay were the same reasons cited on the appeal and in plaintiff’s initial request for extension. Such causes were advanced as being permissible under the contract. Such *61 cannot constitute requests for extralegal relief as contemplated by the statute. They were based on contract. The Senator wrote only “* * * to inquire if * * * some procedure can be followed by Eaylaine * * *” by which it can be relieved of the liquidated damages. He did not even make a plea on behalf of plaintiff.
Senator Bridges’ letter was subsequently answered by the Commanding General of the Philadelphia Quartermaster Depot giving the Senator assurance that the plaintiff’s request would be given every consideration “consistent with the contract terms.” The Senator must have been satisfied with this reply as no further effort was made on his part to aid his constituent. Such indicates the letter was based on contract all the way through and not on extralegal relief.
In its reply brief, the plaintiff, in addition to the aforementioned letters, relies also on letters by it to the contracting officer dated December 11, 1941, and January 24, 1942. The letter of December 11, 1941,[1] merely stated the basis and reasons for the appeal from the contracting officer’s opinion of October 15, 1941, denying plaintiff’s request for an extension of time, and requested him to reverse his decision in plaintiff’s favor. The letter also submitted letters from plaintiff’s suppliers explaining why they were late in their deliveries to plaintiff. The reasons specified in the letter of December 11 as causing the delays related to rights the plaintiff had under the contract and was not based on extralegal considerations.
Plaintiff’s letter of January 24, 1942, also was nothing more than a reassertion of its position that it was entitled to extensions in delivery dates under Article 17 (the delays-damages clause) of its contract with the Government. The letter was merely an acknowledgment of the Government’s letter of January 2, 1942, which acknowledged plaintiff’s *62 letter of December 11, 1941. That letter, as stated above, setting forth the legal reasons why, in plaintiff’s opinion, it should recover under Article 17 of the contract. Any request for relief made in these letters sounds of contract and are not requests for extralegal relief.
Plaintiff, however, points to the fact that the Commanding General of the Philadelphia Quartermaster Depot in his letter of May 14, 1942, to the Quartermaster General in Washington said that the plaintiff’s appeal (referring to the letter of December 11,1941) may be considered as a plea for equitable relief. Subsequent action on the appeal, however, indicates that the Quartermaster General never considered it as such. The Commanding General’s statement would merely indicate that while the plaintiff had no legal right to recovery, there may be some equities involved under which he could fairly be given a remission of all or part of the already assessed liquidated damages. It is merely a recognition by that officer that the plaintiff may be entitled to some form of equitable relief. It does not appear that the Quartermaster General acquiesced in this feeling as he did not proceed accordingly. The statement does not constitute a request for extralegal relief by the plaintiff as required by the Lucas Act.
Nevertheless, plaintiff’s letter of December 11, 1941, is founded only on contract and on nothing else. It continuously refers to the fact that the causes for the delay in delivery were unforeseeable and without its fault or negligence and, this being so, asks for relief from the liquidated damages. The letter even apparently concedes that almost $22,000 of the assessed liquidated damages were justified as the letter only requests the remission of $25,462 of the $47,000 already assessed.
Since there was no request for any relief other than requests which the plaintiff believed to be proper under the contract, the plaintiff is barred from recovery under the Lucas Act, and other issues in the case will not be discussed.
It is so ordered.
MaddeN, Judge; Whitaker, Judge; LittletoN, Judge; and Jones, Chief Judge, concur.
*63 FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Paul H. McMurray, makes the following findings of fact:
1. The plaintiff, a corporation organized and existing under the laws of the State of New Hampshire, pursuant to several contracts and subcontracts, furnished work, supplies and services, in the manufacture of cloth, between September 16, 1940, and August 14, 1945, to the defendant acting by and through the War Department. The latter agency had been authorized to enter into contracts and amendments or modifications of contracts under Section 201 of the First War Powers Act, 50 IT. S. C. app. sec. 611 if such action was deemed to facilitate the prosecution of the war. Pursuant to this act and the regulations promulgated thereunder by the President, the War Department was empowered to release accrued liquidated damages if the statutory standard of facilitating the prosecution of the war was met. Executive Order No. 9001, December 27, 1941, 6 Fed. Reg. 6787. The plaintiff’s action is filed pursuant to provisions of the Lucas Act, 60 Stat. 902.
2. In the performance of plaintiff’s contracts and subcontracts with the Government, plaintiff suffered a net loss of $43,238.93, as reflected by the following tabulation:
Gross sales to Government on prime contracts less returns on allowances- $3,883,192.19
Less: Liquidated damages withheld by Government_ 76,882. 51
Gross receipts from Government prime contracts-$3, 806,309. 68
Gross receipts from Government subcontracts_ 189,258.22
Gross receipts from Government prime and subcon-tracts_ 3,995,567.90

Less: Cost of Goods Sold

Materials_$2,565,681.25
Labor and Commission work- 1,015,386.47
Overhead_ 235,508. 67
Factoring Service charges_ 17,690.26
Interest on advances by factor- 3,102.45
Selling agents charges_ 101,353.10
*64 Less: Cost of (foods Sold — Continued Christmas parties for employees_ $274.71
Total_ 3,938,996.91
Less excess and duplicated charges_ 47,973.72
Cost of Goods Sold under prime contracts _ 3, 891,023.19
Cost of Goods Sold under subcontracts- 157, 994.41
Total Cost of Goods Sold under Government prime and subcontracts_$4,049,017. 60
Gross loss from Government prime and subcontracts_ (53,449.70)

Other Income

Purchases discounts_ 9,520.94
Insurance dividends_ 534.22
Interest on credit balances_ 155.61
Total other income_ 10,210.77
Net loss on Government prime and subcontracts_ (43,238.93)
3. At Christmas time in the years 1942 and 1943 the plaintiff gave Christmas parties to its employees. The sum of $274.71, representing a pro rata allocation of the cost of those parties to government contracts, has been included as a cost of performance of these contracts.
4. Liquidated damages, stipulated here in the amount of $76,882.51, were deducted from payments made by the defendant to the plaintiff. The liquidated damages were assessed by the contracting officer pursuant to the contract provisions for two reasons: (1) The causes assigned by plaintiff as the reason for the delays in deliveries were not unforeseeable at the time the contract was entered into, and (2) plaintiff failed to comply with the provisions of the liquidated damages clause of the contract, set forth in full in finding 6, under which plaintiff was required to notify the contracting officer in writing of the cause of any delay in delivery within 10 days from the beginning thereof as a condition precedent to the granting of an extension. The decision to assess liquidated damages against the plaintiff was made by the Contracting Officer, Lieut. Col. Thomas W. Jones on October 15,1941. This decision was appealed from by plaintiff on November 13, 1941, less than 30 days after *65 the rendition thereof in conformity with the provisions of the Delays-Damages clause of the contract. (See finding 6.)
There is no indication that this appeal has ever been acted upon. A subsequent letter of December 11,1941, from plaintiff to the contracting officer was erroneously construed as the initial action for appeal. A decision was subsequently rendered on the basis of an appeal initiated on December 11, 1941, such decision assigning as an additional reason for denial of plaintiff’s claim to remit liquidated damages that the plaintiff did not appeal from the decision of the contracting officer within 30 days as required by the contract. These letters appear in more detail in subsequent findings.
5. In computing costs of materials, commission work and overhead in their stipulation, the parties have used billed costs instead of net costs or discounted costs pursuant to standard accounting procedure. Purchase Discounts ($9,520.94) and Interest Income ($155.61) have been included as Other Income.
6. Plaintiff had twelve (12) prime contracts for the manufacture of cloth for the Army. The Delays-Damages clause of sis of them-identified as W 669 qm-8140, dated June 19, 1940, W 669 qm-8798, dated September 10, 1940, W 669 qm-9500, dated October 29, 1940, W 669 qm-9864, dated November 22, 1940, W 669 qm-10270, dated December 17, 1940, W 669 qm-11556, dated April 1, 1941, provided as follows:
Article 17. Delays — Damages.—If the contractor refuses or fails to make delivery of acceptable material or supplies within the time or times specified in Article 1, or any extension or extensions thereof, the actual damage to the Government for the delay will be impossible to determine, and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay in the delivery of any articles, the amount as set forth in the specifications or accompanying papers, and the contractor, and his sureties shall be liable for the amount thereof: Provided, however, That if the contractor fails to make delivery of any portion of the material or supplies within the time specified, the Government reserves the right to terminate the right of the contractor to deliver all or any portion of the undelivered material or supplies, and to purchase similar material or supplies in the open *66 market or secure the manufacture and delivery thereof by contract or otherwise, charging against the contractor and his sureties any excess cost occasioned the Government thereby, together with liquidated damages accruing until such time as the Government may reasonably procure similar material or supplies elsewhere: Provided, further, That the contractor shall not be charged with liquidated damages or any excess cost when the delay in delivery is due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God or the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and delays of a subcontractor due to such causes unless the Contracting Officer shall determine that the materials or supplies to be furnished under the subcontract are procurable in the open market, if the Contractor shall notify the Contracting Officer in writing of the cause of any such delay, within 10 days from the beginning thereof, or within such further period as the Contracting Officer shall, with the approval of the head of the department or his duly authorized representative, prior to the date of final settlement of the contract, grant for the giving of such notice. The Contracting Officer shall then ascertain the facts and extent of the delay and extend the time for making delivery when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision in such appeals as to the facts of delay and extension of time for making delivery shall be final and conclusive on the parties hereto.
The assessments of liquidated damages against plaintiff were made pursuant to the above provision and under the above contracts.
Such contracts containing liquidated-damages clauses were awarded between June 19, 1940, and April 1, 1941, and accounted for sales less returns and allowances amounting to $1,558,503.65 from which liquidated damages amounting to $76,882.51 or 4.9 percent were deducted and the balance of $1,481,621.44 paid plaintiff. The six other contracts, W669-qm-15649, dated February 5, 1942, W669-qm-15903, *67 dated February 13, 1942, W669-qm-l7604, dated April 20, 1942, W669-qm-19276, dated June 4,1942, W669-qm-21871, dated October 6,1942, and W669-qm-28397, dated April 26, 1943, did not contain liquidated-damages clauses, were awarded between February 5, 1942, and April 26, 1943, and accounted for $2,324,668.54 in sales less returns and allowances from which, there was no deduction for liquidated damages and the whole amount of which was paid plaintiff.
7. Although the contracts contained an express requirement that plaintiff notify the Contracting Officer, in writing, of the cause of any delay in delivery within ten days from the beginning thereof, the plaintiff did not comply with that requirement. The issue of delay in deliveries was first brought to the plaintiff’s attention by the Contracting Officer in his letter dated May 6,1941, which pointed out that plaintiff’s performance under contract W669-qm-10270 and under other recent and current contracts, in so far as deliveries of cloth were concerned, was unsatisfactory and perilously hampering to the Army Quartermaster Depot’s garment cutting schedules.
8. Under contract No. W669-qm-10270 liquidated damages amounting to $49,771.09 were deducted by defendant from plaintiff’s net sales of $635,467.06 amounting to 7.8 percent of such sales total. The first deliveries thereunder were due May 4,1941. In reply to defendant’s letter of May 6, 1941, referred to in finding 7, the plaintiff, on May 12, 1941, by letter to the Commanding Officer of the Philadelphia Quartermaster Depot with whom the plaintiff had the contract, acknowledged to the Government the seriousness of late deliveries under the contract and assured the Government that it would be able to catch up within two months. It further assured the Government that it had sufficient wool on hand to complete the contract in question and gave reasons for the then already late delivery. Plaintiff indicated additional facilities would be utilized to catch up if necessary. In addition to the paragraph appearing below, plaintiff further informed the Government that any additional information it may require would be supplied upon request. The above-mentioned paragraph is as follows:
*68 As yon probably realize, on earlier contracts we have gone to a very considerable expense in fitting up machinery so that we would be able to take care of this type of business. We now believe we have overcome most of our difficulties and from now on should be in a good position to meet the delivery requirements on whatever we undertake to do.
This letter, which was within the scope of the contract provision that a request for an extension of time of delivery had to be made within ten days from the time the cause of the delay arose, did not make a request for an extension of time within which to deliver and cannot be construed as such.
9. Plaintiff did, however, subsequently make a request for extension of the delivery date on July 9, 1941. This request related only to contract number W669-qm-l0270 under which two-thirds of the total liquidated damages paid by plaintiff were assessed, and sought a six weeks’ extension. In the letter the plaintiff assigned the following reasons for requesting the extension:
1. Combing difficulties.
2. Delay in delivery of needed repair parts.
3. Delay in delivery of additional equipment. (In respect to this, plaintiff stated that the sellers advised that the reason for the delay in delivery was their inability to get steel from the mills due to the steel shortage.)
4. Mechanical difficulties.
5. Absorption of needed mechanical help by the Portsmouth Navy Yard and other plants in the vicinity also handling Government contracts.
6. Difficulty in securing necessary pins for French Combs that had to be imported from England.
The contracting officer replied to this letter on July 29, 1941, informing the plaintiff that he had to make an investigation before a time extension could be granted. To facilitate that investigation, the contracting officer requested the plaintiff to answer by affidavit the following inquiries:
a. On what date or dates did you order the repair parts and what were these parts ?
b. From what company or companies were these repair parts ordered ?
*69 c. On what date or dates were these repair parts promised?
d. On what date or dates were these repair parts delivered ?
e. Was the delay in delivering these repair parts due to priorities and if so, state number of the certificate, date of issue, and name of the Governmental agency issuing such certificate.
f. On what date or dates did you order the additional equipment and what machines were involved?
g. From what company or companies did you order this additional equipment ?
_ h. On what date or dates was the delivery of this additional equipment promised ?
i. On what date or dates was this additional equipment delivered?
j. Since your letter indicates that the delay in delivering this equipment is attributable to priority, state number of the certificate, date of issue, and name of the Governmental agency issuing such certificate.
Plaintiff answered these inquiries by letter on August 18, 1941, but the contracting officer refused to accept the answer as it was not in the form of an affidavit. He also criticized some of plaintiff’s replies as being inadequate and indicated that further consideration could be given to the request for an extension of the delivery dates only upon receipt of the aforementioned affidavit containing adequate answers.
Plaintiff, on September 15, 1941, replied by letter, which letter contained a rewriting of its letter of August 18,1941, in the form of an affidavit and with more complete answers to the above inquiries. These answers are as follows:
a. In answer to the date or dates on which we ordered repair parts, orders were sent for comb pins May 8, 16, and 28.
b. These repair parts were ordered from E. H. Hood Company of Philadelphia.
c. At the time the orders were placed we were promised prompt shipment. In normal times these parts were carried in stock and shipment in two or three days would constitute prompt shipment.
d. Orders placed May 8 — delivered August 20. Orders placed May 16 — partial delivery May 20, balance August 13. Orders placed May 23 — delivered August 20.
e. In this case, delivery had to come from England.
*70 f. In answer to the date or dates additional equipment was ordered, we made arrangements to have complete combing plant put into shape for us about October 1st. About May 1st additional gill boxes were ordered.
g. The combing equipment was ordered from the the Amoskeag Industries of Manchester, New Hampshire. In addition, gill boxes were ordered from the American Gill Screw Company of Providence.
h. The combing plant was to be ready December 31st and the gill boxes were promised for two weeks delivery.
i. The combing plant was not put into operation until the end of January. The gill boxes were delivered July 17th, about two months after they were promised.
j. The American Gill Screw Company advised that they were unable to complete our contract as they were unable to procure the steel from their regular source as this source was held up by priorities.
In other parts of the letter plaintiff explained that in order to get the information requested by defendant in query j, they would have to contact their suppliers who in turn will have to find out from their sources of supply the certificate numbers, etc., and since it would cause considerable delay, plaintiff promised that they would answer this inquiry properly in a further letter.
Pursuant to this promise, plaintiff wrote the contracting officer on October 9,1941, as follows:
* * * we will be unable to give you an answer to question “J.” We requested the American Gill Screw Company to get this information for us and had expected that they would. However, we have just received a letter from them stating that their delay in supplying the gill boxes was not due to priorities although they admit that they were late in delivering them. It appears that the way priorities came into this situation was through a statement of a representative of theirs who evidently used this excuse for their being late. Under the circumstances we will have to ask you to disregard this part of our original letter.
We hope that we may receive favorable action on our request for additional time as according to our records it has cost us $45,252.46 on account of penalties in supplying goods to the Quartermaster Depot from September 30, 1940 to September 30, 1941 which for a mill of our size is very serious.
*71 All of the letters in this finding refer only to contract number W669-qm-10270.
10. The request for time extension was denied by the contracting officer in his decision of October 15, 1941. This decision was appealed from on November 13, 1941, as outlined in Finding 5, and hereafter in this finding.
The contracting officer’s decision of October 15,1941, was as follows:
This will acknowledge receipt of your letter dated October 9,1941, wherein you submit additional information relative to your request for an extension of time within which to make deliveries under Contract W 669 qm-10270.
In this connection, your attention is directed to the liquidated damages clause, which provides, in effect, that damages shall be assessed for refusal or failure to make deliveries of acceptable material or supplies within the time or times specified, and further provides that an extension of time for making deliveries can be granted when the delay in delivery is due to unforeseeable causes, beyond the control and without the fault or negligence of .the contractor.
It appears from the records of this Depot that you attribute the delay in production and delivery to the following alleged causes:
fa) Combing difficulties
(b) Lack of trained help in Manchester, N. H.
(c) Inability to secure “spot” top
(d) Top dyeing slower than expected
(e) Delay in delivery of needed repair parts
(f) Delay in delivery of additional equipment
(g) Delay in repairs required due to break-down
(h) Trouble getting combing plant into shape
However, since you submitted a bid in which you agreed to manufacture cloth conforming to definite specification requirements, and to make deliveries of acceptable material within the time specified, it is presumed that, at the time you submitted your bid, you were cognizant of these requirements, and it would appear that the delay in delivery attributable to the aforementioned causes cannot be construed as delay due to causes that were unforeseeable, beyond your control and without fault or negligence on your part. Furthermore, it appears from the records of this Depot that you have failed to comply with the provision of the liquidated damages clause of the contract, under which you were *72 required to notify the Contracting Officer in writing of the cause of delay within ten (10) days from the beginning thereof as a condition precedent to the granting of an extension of time for meeting deliveries.
Therefore, in view of the foregoing, your request for an extension of time is not granted.
The letter of appeal is as follows:
This is in further reference to my talk with Lieut. Colonel Jones in Philadelphia yesterday.
Following the advice of what is necessary for us to do, given by 2nd Lieut. H. F. Nelson, we are writing this to re[s]pectfully ask for an appeal from the decision in your letter of October 15, wherein our request for a six weeks’ extension was refused.
We will, within a few days, submit various letters substantiating our claims, so that they may be reviewed by your office, and we understand that it is not necessary for us to make a formal appeal to Washington until you have had a chance to again review the facts.
The contracting officer acknowledged receipt of this letter on November 19,1941, and his letter of that date is as follows:
This will acknowledge receipt of your letter dated November IB, 1941, in connection with your request for an extension of time within which to make deliveries under Contract W 669 qm-10270.
It is noted from your aforementioned letter that you intend to submit additional information to support your request and pending the receipt of this information, no further action can be taken in this matter.
The additional information referred to in the above letters was supplied by plaintiff by letter under date of December 11,1941, which follows:
Reconsideration of your decision of October 15, 1941, is respectfully requested.
Following our letter of November 13, we are attaching letters listed below which we hope will be favorably received as additional evidence that the delays were due to causes unforeseeable, beyond our control and without negligence on our part; regardless of the fact that such causes cannot be attributed to any specific instance of compliance with the regulations covering priorities and allocation.
1. R. H. Hood Co., Philadelphia, Pa.
*73 2. Amoskeag Industries, Inc., Manchester, N. H.
3. Amoskeag Machine Co., Manchester, N. H.
4. American Gill Screw Co., Providence, N. H.
5. Amoskeag National Bank, Manchester, N. H.
6. Florence Dye Works, Woonsocket, R. I.
7. The Leavitt Stores, Manchester, N. H.
We have met with great reluctance on the part of all of our suppliers in getting any letters and facts at all to put before you. They refuse to get into what they call a “Government controversy.” It has been very difficult to get full explanatory letters; the letters themselves will show the situation.
This mill is not requesting remission of the entire $47,000 fines paid on this contract (though it might with reasonable justice do so). We are stating that six weeks of the delay was due to situations unforeseeable when the Contract was taken, and that events beyond the control of this Mill were responsible.
It is submitted that since liquidated damages clauses in supply contracts of the War Department are now being used only in exceptional cases, due to the general emergency conditions existing today, there should be no desire, reason or effort by the Government to penalize this Company, which entered into O. D. Contracts prior to liberalizing and elimination of various penalty clauses.
There has been created in the Office of the Under Secretary of War a special board to hear cases of this nature. It is respectfully requested, if you cannot vacate or reverse the decision of October 15,1941, that this file be submitted to Washington, and we be given opportunity to appear, and that the data submitted herewith be forwarded to the proper Board.
During the 6 weeks time of these fines the Government has not been harmed by late delivery of this small Mill; but these are a serious financial blow. We are in a very undesirable financial situation, unable to meet current obligations, except through the aid of a N. Y. Banking Factor. These fines work out as a punishment to an outfit that has spent considerable money to equip for this Government work. The very regulations that have been inaugurated since this contract was taken show that punishment is not the Government intention.
On this Contract, #10270, we have paid fines of $35,947. Cloth now at the Depot will add $11,260 in additional fines (total over $47,000). The remission of six weeks’ fines we so urgently request and need amounts to $25,462.
*74 The paid-in capital of this Mill is $200,000. Therefore, these fines represent a serious part (24%) of our entire capital.
During the year, our shipments to the Government were $1,200,000. The result of the year’s operations shows a profit of only $2,500 during the most profitable year that the Woolen Industry has known. This profit was wiped out by fines of the next month. These fines are actually a serious menace to us.
In the September 16 issue of the War Department’s Supply Contract Form No. 1, there is a paragraph which relates to causes beyond control etc. of the contract, including acts of the Government, and we submit that the various Government projects and contracts in the vicinity of Manchester, N. II., which are distinctly acts of the Government, were among the unforeseeable causes of our labor and other troubles.
We earnestly hope the Depot will see the justice of our plea and grant us this needed relief.
The letters in support of plaintiff’s appeal which it attached to its above letter of December 11, 1941, follow.
R. H. Hood Co.’s letter of November 11, 1941 read as follows:
We understand you have been seriously inconvenienced by non-delivery of certain items of steel pins which you have been ordering from us in the past. We believe an explanation of why we were unable to make prompt shipment in every case is due you.
The pins of the type you use on your French Combs are not manufactured, to our knowledge, in the United States, and all of them are imported from England. Therefore, when we received your orders for various sizes and did not have them in stock we were totally unable to ship until further supplies reached us from England. Naturally, you will realize that due to war conditions and extremely difficult shipping conditions it has been impossible for us to make quick deliveries on some items on which our stocks were depleted. We were able to ship you some sizes, but we realize that with manufacturing conditions as they are that the lack of one or two sizes would prevent you from completing repairs on your French Combs.
In reviewing some of the orders which we find we were able to complete, we find your orders #692, #739, #782, and #994 all required about 2 to 3 months for us to complete delivery, and we assure you, that this time was necessary to secure the material from England.
*75 Needless to say, we regret any delays we have caused you but we assure you these were entirely beyond our control and we are entirely dependent on our supplies of these items on shipments from England which have very frequently been delayed since hostilities started. We hope, therefore, that you will understand any delay in shipping you the material was entirely due to a cause which was beyond our control.
Amoskeag Industries, Inc.’s letter of November 21, 1941 read as follows:
Based on information and promises made to us by the Amoskeag Machine Company who did the installation and repair work for the Raylaine Worsteds top manufacturing unit, we in turn promised Raylaine Worsteds that this work would be complete sometime before December 31, 1940; so that you could start processing for your government contracts.
Actually, the installations and various replacements and repairs were not finished so as to be in use before the end of January 1941. This was due to various causes beyond our control or the control of the Amoskeag Machine Company; due to conditions caused by the increasing war demands, the losing of skilled labor, and delay in getting materials for the machine shop.
Trusting this is the information you require for the Quartermaster.
Amoskeag Machine Co.’s letter of November 12,1941, read as follows:
Referring to letter dated November 21, 1941, from Amoskeag Industries, Inc., to Raylaine Worsteds, in regard to delay in completing installation of top manufacturing unit to be used by Raylaine Worsteds, we were delayed due to increasing war demands, losing of skilled labor, slow delivery of materials for machine shop; so that the top installation could not start processing wool before end of January 1941.
American Gill Screw Company’s letter of November 6, 1941, read as follows:
Please be advised that the reason we were late in filling your order for two Gill Boxes was because we were not able to get all the necessary materials to build these machines, as soon as we expected.
Florence Dye Works’ letter of November 19, 1941, read as follows:
*76 In answer to your phone request for a detailed letter that you can submit to the Government on our delays in delivering O. D. top to Raylaine, particularly on the 18 ounce light serge, we have gone into this in detail.
There were many contributing causes beyond our control making the delivery of the Government colors slower than we promised you. Many of our submissions were rejected two and three times for color matching, though we ourselves believed they looked pretty good, but when samples were woven by you the Government rejected the shades.
We found that the Depot was more lenient last year in approving shades, and because they were so critical we have been compelled to make two or three submissions, and figuring one to two weeks on each submission, this in itself would cause a delay beyond our reasonable delivery promises.
As the Government requirements increased we found ourselves blocked so that we could not live up to our promised schedules with you.
As business conditions improved, we found it impossible to get our labor to work overtime, nor have we been able to make up time lost due to holidays, etc., as we have in the past.
We have had trouble with breakdowns on our Diesel Engines, and were compelled to stop parts of the Plant. We do not have to tell you how difficult it has been to get repairs of this kind done.
We are, naturally, sorry that our delinquencies so materially contributed to your delays. However, we think that the Inspectors for the Government, who have been around our Plant constantly, will verify that it has been impossible to foretell all of the matters that have come along during the last year to stop production.
The decision, appeal and letter of information of December 11, 1941, contained in this finding all relate only to contract number W669-qm-10270.
11. By letter of January 2, 1942, the contracting officer notified plaintiff that he was going to forward plaintiff’s request to higher authority. That letter in its entirety is as follows:
Reference is had to your letter of December 11, 1941, relative to your request for an extension of time within which to make deliveries under Contract W 669 qm-10270.
*77 Inasmuch as this Depot is not in a position to take favorable action on your request, this matter will be forwarded to higher authority for compliance with the request contained in the first paragraph of the second page of your letter.
It appears from the records of this Depot that you have not as yet completed deliveries under this contract, and inasmuch as an audit of your account with respect to all payments will have to be made and submitted to Washington with this Depot’s administrative report, it is not expected that this Depot will be able to forward such report for about sixty days.
Plaintiff replied to this communication on January 24, 1942, as follows:
This is to acknowledge receipt of your letter of January 2nd, and to apologize for not answering sooner, but we withheld answer until all present Eaylaine contracts were completed; and also because of other facts which have developed with this Corporation since our letter of December 11th was written.
The writer has, during that time, been elected President of this Corporation, and money has been put into the Company by Terhune, Yereance & Wolff, Inc. and others.
Naturally, because of the total fines of over $85,000, this Mill is facing a very difficult financial situation and hardships due to all these penalties, and would truly appreciate anything that you may be able to do to expedite this case.
# We sincerely hope it will not need the full time outlined in your last letter, as our entire situation is naturally complicated by this affair.
The receipt of this letter was acknowledged by the contracting officer by letter of January 28, 1942 in which he assured expeditious handling of the case.
12. There is nothing in the record to indicate that the appeal of November 13, 1941, was ever “technically” acted upon, however, the contracting officer, by letter on May 12, 1942, pursuant to his promise in his letter of January 2,1942, forwarded plaintiff’s letter of December 11, 1941, to the Quartermaster General indicating that the contractor was not entitled to relief since it failed to give proper notice of delay as required by the contract; since the causes for delay were not unforeseeable; and since the appeal from his deci *78 sion was not timely filed. The contracting officer incorrectly said that there was no notice of appeal within 80 days of his decision as required by the contract and never laid plaintiff’s letter of appeal of November 13, 1941, before the Quartermaster General. He did point out, however, that the appeal might be construed, in effect, as a plea for equitable relief and, if so construed, relief might be granted under Executive Order No. 9001 by the Secretary of War if deemed appropriate.
The Quartermaster General referred plaintiff’s claim to the Comptroller General of the United States who denied the claim on September 11, 1942 with the following language:
Since the delays were not due to any of the causes for which the contract authorizes remission of liquidated damages and as you failed to notify the contracting officer in writing of the cause of the delay within 10 days from the beginning thereof, there appears no authority for remission of any of the amount claimed.
The plaintiff wrote to that official, on September 29,1942, seeking further review and stating in part as follows:
Our total fines were well above $75,000.00. Our total capitalization is $200,000.00. We are not protesting the bulk of these fines as we agree they were justified. We do believe that relief on approximately $25,000.00 should be granted as we were in constant touch with the Quartermaster about the delay on these quantities, both by phone and letter. It was for this reason that the ten day notice, required in the contract was not written. It is our hope that we will not be penalized by this technicality if our claim on the $25,000 is just.
The plaintiff wrote a very similar letter on November 9, 1942, containing the exact language above quoted. The Comptroller General of the United States, by his decision of December 8,1942, B-30131, sustained his earlier disallowance of plaintiff’s claim.
13. In addition to the above letters, there was continuous correspondence between the plaintiff and defendant from May 6, 1941, until at least January 2, 1942, and probably after that until final completion of the contracts by the plaintiff, relating to delays in delivery of the materials under *79 the contracts. Plaintiff continually made promises for new delivery dates, subsequently broke them and was criticized for this by the contracting officer. On at least one occasion, the contracting officer warned the plaintiff of the possibility of his right to deliver being terminated.
14. By letter of February 5,1947, addressed to the Quartermaster Purchasing Office, New York, the plaintiff sought remission of the liquidated damages, paid under the six contracts involved, pursuant to the Lucas Act, Public Law 657 of the 79th Congress. This claim was denied by the War Contract Hardship Claims Board, on December 22,1949, primarily on the ground that, in the Board’s opinion, claimant had not at any time requested the War Department to grant First War Powers Act relief with respect to any of the losses included in its claim. On January 23, 1950, plaintiff filed a motion for reconsideration which was granted. However’, the Board, in a second opinion on February 16, 1950, adhered to its original conclusion and again denied the claim.
15. In addition to plaintiff’s letter of December 11, 1941, referred to in Finding 10, supra, three additional letters were written to the Commanding General, Philadelphia Quartermaster Depot. These are the letters on which plaintiff relies for relief under the Lucas Act. They are all requests, written on behalf of the plaintiff, for relief from or reduction of penalties (liquidated damages) imposed under prime contracts with the War Department. They are quoted in full as follows:
November 29, 1941.
This letter is written at the request of Raylaine Worsteds, Inc., in connection with its petition for waiver or reimbursement of penalties asserted against Raylaine Worsteds, Inc., in accordance with the terms of certain contracts it has entered into for the supply of woolen cloth for the Quartermaster Corps.
We have no knowledge of the causes for the delays which have given rise to the penalties and have no interest in the profits of the Company, either directly or indirectly, except as we have made, with other local banks, current working capital loans to the company which have always been promptly, paid.
We are able, however, and desire to assure your Department that Raylaine Worsteds, Inc. deserves careful *80 consideration of its petition because of its importance to the manufacturing situation here in Manchester. It is one of the companies affiliated with Amoskeag Industries, Inc., which in 1936 bought from the Trustees in Bankruptcy of Amoskeag Manufacturing Company, the mills and machinery of that company which had been by far the largest employer of labor in this city. The enterprise has been financed entirely by local capital and has been conducted as a community enterprise with the end in view of attracting business to the City and providing payrolls for the workers formerly employed in the old Company. The Company has had a large measure of success in its efforts.
Raylaine Worsteds, Inc. was organized in 1938 to engage in manufacturing at a time when no outside capital could be attracted into manufacturing here. This. company has now developed into a concern employing approximately eight hundred people. They had no experience with Government contracts and doubtless did not appreciate the severe penalties which were provided for in the contract. It has been administei'ed by high-grade, reputable people and we should have confidence in their statements that most of the delay has been due to causes outside their control.
In any event we know that the Company has made a good record and has added very considerably to the improvement of manufacturing conditions here in Manchester and we make this statement in the hope that it may be helpful to you in your consideration of their petition.
Very truly yours,
H. E. Straw, President.
The Amoskeag National Bank, Manchester, N. H.
December 12, 1941.
As an Honorary Director of the Raylaine Worsted Mills, without any financial interest in it whatever, there has been called to my attention the severe penalties placed on this company for failure to deliver on time orders taken for the United States Government.
To give you a background of this mill — it was started by local capital, primarily to put people to work, after the great disaster of the Amoskeag Mills going out of business, leaving thousands of people without means of a livelihood. With a small capital, this mill was started anticipating to employ about one hundred people, but eventually worked up to give employment to over eight *81 hundred. They, together with many other small plants, after six years, are now giving employment to over half the number formerly employed by the large Amoskeag Company and have saved this city from disaster.
These fines have been a great hardship to the Company, as the operating statement will show. My principal interest is that being the President of the largest department store in the state, employing from two hundred and fifty to three hundred people, in order to be able to have that many employees, we must have industries going, as Manchester is composed mostly of working people in an industrial city that grew up around the former Amoskeag Company.
I hope, after investigation, you will give consideration to this company.
Yours very truly,
Leavitt Stokes Corporation,
F. H. Burrell,

President <md General Manager.

DECEMBER 13,1941.
It has been brought to my attention that fines exceeding $75,000 have been levied against Raylaine Worsteds Incorporated of Manchester, New Hampshire, as a consequence of its delay in completing contracts awarded by the Philadelphia Quartermaster Depot. Certain circumstances giving rise to the late delivery of goods against these contracts have come to my attention also.
My advice is that about a year ago Raylaine Worsteds Incorporated took over machinery formerly used by the Worsted Division of the Amoskeag Mills of Manchester. Raylaine Worsteds Incorporated was one of the industries opened in Manchester in connection with the effort of that community to reclaim losses entailed by the closing of the Amoskeag Mills, which was one of the largest industrial plants in the country.
I am informed that it was necessary to move certain of the machinery and prepare it for operation in an altogether new location and that for this job skilled workers were required, but that few were available at that time; that due to the lack of the necessary skilled workers there was a delay of several weeks in putting the machinery in condition for operation.
I am further informed that another reason for the delay was the fact that parts necessary for the repair of these machines had to be procured outside of the United States and due to the critical international situ *82 ation, there was considerable delay in delivery of the parts.
My information is that the fines exceeding $75,000 constitute approximately one-third of the invested capital of Raylaine Worsteds Incorporated and that if payment is forced, the industry will be greatly crippled.
Because of the unfortunate experience which the City of Manchester, New Hampshire, has previously had in its industrial life and because its each new industry is vitally important to its people, I am writing to inquire if, in view of the circumstances I have been informed governed the delay of deliveries against the contracts, some procedure can be followed by Raylaine Worsteds Incorporated by which the fines can be withdrawn or appreciably lowered and the Company allowed to continue its operations without this burden.
I want you to know I should deeply appreciate any possible and practicable consideration you can give this appeal.
Sincerely yours,
Styles Bridges, United, States Senator.
16. The Commanding General of the Philadelphia Quartermaster Depot answered Senator Bridges letter in part as follows:
A review of the Depot’s records discloses that the Raylaine Worsteds Incorporated are currently operating-under two contracts, W 669 qm-10270 and W669 qm-11556. A representative of the contractor, Raylaine Worsteds Incorporated, visited this Depot about a month ago in connection with his company’s request for an extension of time within which to make deliveries under Contract W 669 qm-10270. During this interview, the representative indicated that there was certain additional information which he desired to submit, and requested this Depot to withhold its decision until this information was received.
At the conclusion of the interview the Depot advised that all evidence which the contractor submitted would be taken into consideration in reaching a decision and that such decision would be held in abeyance pending the receipt of this information. Under date of December 16, 1941, the data hereinbefore referred to was received at this Depot, and you are assured that every practicable consideration consistent with, the terms of the contract and the rules and regulations covering the *83 administration of Government contracts will be given to the merits of your constituent’s request.
17. No action has been taken with respect to plaintiff’s contracts under the Contract Settlement Act of 1944.
It was stipulated by the parties to this action that, under the Renegotiation Act, no excessive profits were earned by the plaintiff in the years ending September 30, 1942; September 30, 1943; September 30, 1944, which constitute the period involved in this action; and also that no demand for refund of excessive profits was made on the plaintiff and no amount of money representing excessive profits was refunded by the plaintiff.
18. On March 21,1950, the plaintiff filed its petition in this court. The defendant moved to dismiss the petition on May 2,1951, on the ground that plaintiff had not filed any requests for relief with any appropriate department or agency of the government as required by the Lucas Act. The motion was orally argued before this court on June 4, 1951, and the defendant’s motion was overruled by the court, without written opinion, on July 9,1951,119 C. Cls. 838.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and its petition is therefore dismissed.

 As noted in other parts of this opinion, in its letter of May 14, 1942 to the Quartermaster General, the contracting officer, erroneously classified plaintiff’s letter of December 11, 1941, as the letter of appeal and pointed out that such appeal was not taken within 30 days of the contracting officer’s decision on October 15, 1941. Plaintiff’s letter of November 13, 1941, was actually the letter of appeal hut was never laid before the Quartermaster General. It seems that the net result of the error is of no effect, however, since the Quartermaster General evidently treated plaintiff’s appeal, as referred to him, as adequate and proper and did not assign as a reason for denying recovery the fact that the appeal was untimely.