The **UNITED STATES**, Appellant,

v.

**TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, Red Lake and Pembina Bands, Little Shell Band of Montana, and Little Shell Band of North Dakota,** Appellees.

**Appeal No. 8–78.**

United States Court of Claims.

Dec. 12, 1979.

Dean K. Dunsmore, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for appellant. Robert E. Fraley, Washington, D. C., of counsel.

Glen A. Wilkinson, Washington, D. C., attorney of record for Turtle Mountain Band of Chippewa Indians, for the appellees.

Rodney J. Edwards, Duluth, Minn., attorney of record for Red Lake and Pembina Bands.

Lawrence C. Mills, Chicago, Ill., attorney of record for Little Shell Band of Montana and Little Shell Band of North Dakota.

Marvin J. Sonosky, Harry R. Sachse, Sonosky, Chambers & Sachse, Washington, D. C., Stormon & Stormon, Rolla, N. D., Frances L. Horn, Wilkinson, Cragun & Barker, Washington, D. C., Jack Joseph, Chicago, Ill., Louis L. Rochmes, Washington, D. C., and Mills & Garrett, Chicago, Ill., of counsel.

Before FRIEDMAN, Chief Judge, NICHOLS and SMITH, Judges.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

FRIEDMAN, Chief Judge.

This is an appeal by the United States from an interlocutory order of the Indian Claims Commission awarding plaintiff Indian bands (appellees here) $52,527,337.97 as compensation for the extinguishment of their aboriginal title to land. The amount is the difference between the fair market value of the land on the date of extinguishment of the aboriginal title and the com-

pensation the government previously paid for the land.[1]

At issue in this litigation is a tract in excess of 8 million acres located in north-central North Dakota on the Canadian border. A group of Chippewas, including plaintiffs, moved westward into this area in the early 19th century and successfully established themselves there. In 1882, the area was surveyed by the government and opened up for settlement. Subsequently, Congress sought to acquire this region and established the McCumber commission for that purpose. Negotiations with the plaintiff bands eventually culminated in a pact, known as the McCumber Agreement, approved in its final form by Congress on April 21, 1904, 33 Stat. 189, and by the Indians on February 15, 1905, under which the plaintiffs ceded title to the land and received $999,887.03.

This is the second time the case has been before us. In the prior appeal, we upheld the Commission's findings (23 Ind.Cl.Comm. 315 (1970)) that the plaintiffs had aboriginal title to the land and that their title was extinguished in 1905 by the McCumber Agreement. *Turtle Mountain Band of Chippewa Indians v. United States*, 490 F.2d 935, 203 Ct.Cl. 426 (1974). In the present appeal, the government does not dispute either plaintiffs' aboriginal title or the inadequacy of the original compensation for its cession. It contends only that the Commission's determination of fair market value at the time of acquisition was incorrect in the two respects discussed below. We reject both of these challenges to the Commission's order and affirm it.

## I.

A. In its previous decision the Commission found that prior to 1905 the plaintiffs had aboriginal title to the land. The government challenged that finding on four grounds 490 F.2d at 941 (203 Ct.Cl. at 437):

(1) Indian title was not acquired prior to the assumption of United States sovereignty through the Louisiana Purchase; (2) there was no exclusive use and occupation by Chippewas because of the presence of large numbers of "mixed-bloods"; (3) any Indian title that may have existed was "extinguished" prior to the 1905 taking; and (4) the findings on aboriginal title are inadequate.

In our opinion we carefully considered and rejected each of those contentions. With respect to the argument that the plaintiffs' aboriginal title was extinguished prior to 1905—which the defendant continues to press here—we stated that the government's argument was that the title "was 'extinguished' before February 15, 1905, when the McCumber Agreement became effective . . . because of the establishment of an Executive Order reservation, the impact of white settlement, or voluntary abandonment of the area by the Indians (or all three together)." *Id.* 490 F.2d at 944, 203 Ct.Cl. at 443.

We declined to consider "new" evidence • on this point which the United States had not offered before the Commission but included in an appendix to its brief, since "no good excuse for this neglect had been suggested" (*id.,* 490 F.2d at 945) and therefore "appraise[d] the Government's points on the basis of the record made before the Commission." *Id.* 490 F.2d at 945, 203 Ct.Cl. at 444. Noting the settled principle that Congress has "the exclusive right to extinguish Indian title" (*id.*) or "to eliminate aboriginal title" (*id.* 490 F.2d at 947, 203 Ct.Cl. at 447–48), we concluded that neither the establishment of the Turtle Mountain Reservation by Executive orders of 1882 and 1884, the entry of white settlers on the land, nor the Indians' alleged voluntary abandonment of the land showed an extinguishment of aboriginal title before 1905.

B. Under well-established principles, that determination is the law of the case

---

1. This order and its accompanying opinion are reported in 43 Ind.Cl.Comm. 251 (1978). The Commission left for future determination the amount of any gratuitous offsets to which the government may be entitled under 25 U.S.C.

§ 70a. This case has been transferred to this court for such future proceedings pursuant to the Act of April 10, 1976, Pub.L. No. 94–465, § 2, 90 Stat. 1990 (to be codified in 25 U.S.C. § 70v).

and impervious to challenge on subsequent appeals. The doctrine of law of the case "expresses the practice of courts generally to refuse to reopen what has been decided." *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). Thus, "once a case has been decided on appeal, the rule adopted is to be applied, right or wrong, absent exceptional circumstances, in the disposition of the lawsuit." *Schwartz v. NMS Industries, Inc.,* 575 F.2d 553, 554 (5th Cir. 1978).

■ This is a compelling case for applying the doctrine. The two grounds upon which the defendant now challenges the Commission's earlier determination that Indian title was not extinguished until 1905— that title was extinguished by the creation through Executive order of a reservation in 1882, or by the "entry [after 1882] of settlers, homesteaders, railroads and others onto the award area"—were fully argued to and considered rejected by us in the prior appeal, and we denied rehearing *en banc.* No litigant deserves an opportunity to go over the same ground twice, hoping that the passage of time or changes in the composition of the court will provide a more favorable result the second time. *See Roberts v. Cooper,* 61 U.S. (20 How.) 467, 15 L.Ed. 969 (1857); *White v. Murtha,* 377 F.2d 428, 431 (5th Cir. 1967); *Lumberman's Mutual Casualty Co. v. Wright,* 322 F.2d 759, 763–64 (5th Cir. 1963).

The provision in the Indian Claims Commission Act that permitted appeals to this court from "any interlocutory determination by the Commission establishing the liability of the United States" (25 U.S.C. § 70s(b) (1976)), confirms the soundness of treating the decision in such an appeal as the law of the case. The provision was designed to give the parties before the Commission the opportunity to avoid the time and expense involved in litigating questions relating to the amount of recovery until the liability of the United States definitively was determined. Having chosen to seek interlocutory review of the Commission's determination of the date of extinguishment of aboriginal title, the government should not be permitted a second chance to litigate that question because it is dissatisfied with the outcome of the first appeal. To permit such relitigation would frustrate the basic policy of the interlocutory appeals provision of the Indian Claims Commission Act.

We have applied the law-of-the-case doctrine to preclude Indian tribes from relitigating an issue determined against them in an interlocutory appeal. *Three Affiliated Tribes of the Fort Berthold Reservation v. United States,* 204 Ct.Cl. 831, *cert. denied,* 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974). We follow the same practice here with respect to the United States.

■ The government contends, however, that the prior decision is not the law of the case because it was rendered in an interlocutory appeal.[2] As we have just seen, however, this argument is inconsistent with the purpose and concept of the interlocutory review provision of the Indian Claims Commission Act. Moreover, it is a common practice in this court first to determine liability and then to remand the case to the Trial Division for computation of damages. Issues fully resolved at the liability stage are not open for reargument in later stages. *See, e. g., Trans Ocean Van Service v. United States,* 470 F.2d 604, 200 Ct.Cl. 122 (1972); *Gearinger v. United States,* 412 F.2d 862, 188 Ct.Cl. 512 (1969). The general rule, in fact, is that "once affirmed on ap-

2. The government cites *United States v. United States Smelting Refining & Mining Co.,* 339 U.S. 186, 70 S.Ct. 537, 94 L.Ed. 750 (1950), for this proposition. The Supreme Court viewed the judgment in the earlier decision in that case, however, as nonfinal because it merely remanded the case to an administrative agency for further proceedings; "when the case was first remanded, nothing was finally decided." *Id.* at 198, 70 S.Ct. at 544. It was in that sense that the Court used the language the defendant cites that it "requires a final judgment to sustain the application of the rule of the law of the case." *Id.* at 199, 70 S.Ct. at 544. In the present case, in contrast, our decision in the prior appeal definitively determined that the plaintiffs' aboriginal title was extinguished in 1905, and that was a final judgment on that issue.

peal, . . . an [interlocutory] order loses its interlocutory character and becomes the law of the case." *United States ex rel. Greenhalgh v. F. D. Rich Co.,* 520 F.2d 886, 889 (9th Cir. 1975). *See also National Airlines, Inc. v. International Association of Machinists & Aerospace Workers,* 430 F.2d 957, 960 (5th Cir. 1970), *cert. denied,* 400 U.S. 992, 91 S.Ct. 456, 27 L.Ed.2d 440 (1971) (issue "settled exclusively" on preliminary injunction motion is law of the case).

C. Although law of the case "is not an inexorable command" (*White v. Murtha, supra,* 377 F.2d at 431), as a matter of sound judicial practice, a court generally adheres to a decision in a prior appeal in the same case unless one of three "exceptional circumstances" exists: "the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *Id.* at 432. The government contends that this case comes within the first and third of these exceptions since, it asserts, the original decision was clearly erroneous and works a manifest injustice, and substantial new evidence was presented at the valuation trial. We disagree.

1. The government has not shown that our prior decision either was clearly erroneous or worked a manifest injustice upon it. "[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Zdanok v. Glidden Co., Durkee Famous Foods Division,* 327 F.2d 944, 953 (2d Cir.), *cert. denied,* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). ■ The mere contention that the prior decision was incorrect, or that if the court considered the issue anew, it probably would come out the other way, is not "good reason" for permitting relitigation of an issue decided in a prior appeal. Indeed, a prior decision is the law of the case even when the original decision was rendered

without dispute or when the arguments against the first decision are newly presented at the second appeal. *See Trans Ocean Van Service, supra,* 470 F.2d at 615, 200 Ct.Cl. at 141; *Gearinger, supra,* 412 F.2d at 865, 188 Ct.Cl. at 517; *Bolton v. Murray Envelope Corp.,* 553 F.2d 881, 883 (5th Cir. 1977). There is even less reason for reexamining a prior decision where, as here, the arguments urged in the second appeal were fully presented and considered in the prior one.

■ The purpose of the law-of-the-case principle is to provide finality of judicial decisions. A strong showing of clear error therefore is required before a court should reexamine its decision in the prior appeal. Speaking for the court in *Zdanok, supra,* 327 F.2d at 952, Judge Friendly noted that a conflicting Sixth Circuit opinion, a vigorous dissent to the initial decision, and a great amount of critical discussion of that decision in law reviews made him doubt whether the court would follow its earlier decision if presented with a different but similar factual situation. But, he went on, "[t]his is precisely the situation in which 'the law of the case' is decisive; . . . 'mere doubt on our part is not enough to open up the point for full reconsideration.' " [3]

In Indian claims cases before this court, even "plain" error may not be "sufficiently gross and flagrant to justify breaching the law of the case doctrine." *Three Affiliated Tribes, supra,* 204 Ct.Cl. at 835 (Nichols, J., concurring in the result). In this case, not only is there no "plain error," but the government's failure to present any new indications of error does not even create the doubts that Judge Friendly in *Zdanok* ruled were insufficient to warrant reconsideration of the prior decision.

2. The government's argument that new evidence introduced at the valuation trial justifies reconsideration of the prior decision is not persuasive. This "new" evi-

---

3. The Second Circuit *en banc* subsequently overruled its first *Zdanok* decision. *Local 1251 Int'l Union of United Auto., Aircraft & Agricul-* *tural Implement Workers v. Robertshaw Controls Co.,* 405 F.2d 29 (2d Cir. 1968).

dence, all pertaining to the scope of white settlement before 1905, covers basically the same ground as the evidence that the government attempted to get before the court on the prior appeal after it had failed to introduce it before the Commission. We there declined to take judicial notice of this material because it "comes too late," and the government had not shown any valid reason for its failure to present the evidence to the Commission. 203 Ct.Cl. at 443, 490 F.2d at 945. Evidence submitted too late for consideration on this issue in 1974 cannot be used 5 years later as justification for reopening this issue.[4]

In addition, the evidence is irrelevant under the rationale of our prior decision. The basis of that decision was that Congress has the exclusive power to terminate aboriginal title, that Executive action could not have that effect unless Congress clearly had manifested its intention that that action do so, that Congress had not authorized termination of plaintiffs' aboriginal title by Executive order, and that "if the Executive Order reservation was ineffective, in these circumstances, to end the aboriginal ownership, it follows *a fortiori* that the acts of private citizens were also insufficient." *Id.* 490 F.2d at 947, 203 Ct.Cl. at 447. The additional evidence is relevant only to the government's contention that settlement and development of this area by private parties between 1882 and 1905 terminated title. Since that evidence could not affect the basis upon which we acted in our prior decision, it does not justify reopening that decision.

### II.

■ A. The government also argues that the Commission applied an incorrect standard in valuing the plaintiffs' land as of the extinguishment date of February 15, 1905, at $53,527,225. By 1905, the land was covered by a railroad network "described as the most extensive rural system per population in the United States at this time."

*Turtle Mountain Band of Chippewa Indians v. United States*, 43 Ind.Cl.Comm. 251, 284 (1978). Approximately 95,000 non-Indians lived in the area, almost 24,000 of whom lived in the 34 towns there. The tract's highest and best use was commercial agriculture, and in 1905 there were from 14,000 to 15,000 operating farms in the tract, utilizing at least 5 million acres of land. Most of the amenities of civilization were present in the area. *Id.* at 282–87.

The government contends that the enhancement in the value of the land brought about by this development was "created by the activities of the United States or by the activities of others whose actions are imputable to the United States," and that the governing principle here is that "in the taking of lands the United States is neither required to pay for the enhancement in value created by the United States, nor may the United States take advantage of any depreciation in value caused by its actions." It points out that the government furnished the white settlers with land under the Homestead Act and also granted land to the railroads for rights-of-way. The government's expert witness, therefore, "appraised the tract as raw virgin land as the surveyors saw it [in 1882], [b]ut . . appraised it in this condition as of February 15, 1905." Under this approach, the government urges a 1905 value of between $22,225,385 and $24,312,117.

The Commission rejected this theory, and held (43 Ind.Cl.Comm. at 272):

> While it is true that the Indians are not entitled to the value of the improvements which were placed on the lands prior to the 1905 valuation date, the value enhancement resulting from those improvements is properly included in the fair market value of the tract.

B. The Commission's decision correctly applied the principle this court has followed in the valuation of aboriginal title Indian land.

---

4. *Cf. National Airlines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 430 F.2d 957, 960 (5th Cir. 1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 456, 27 L.Ed.2d 440 (1971) ("The exception to law of the case where 'evidence on a subsequent trial [is] substantially different' is inapplicable where by the prior appeal the issue is not left open for decision.").

In *Tlingit & Haida Indians v. United States*, 389 F.2d 778, 788–89, 182 Ct.Cl. 130, 146–47 (1968), the court held that the compensation to be paid by the government for land held by aboriginal title includes the enhanced value of that land resulting from white settlement:

> Defendant contends that the townsites as such have no additional value other than as acreage is valued generally in each area. This, it says, is true because the townsite values were increased by activities of white settlers. We reject this argument.
>
> \*     \*     \*     \*     \*     \*
>
> \*  \*  \*  [T]he fact that the value had increased up to that date because of white settlers, etc., makes no difference. We are concerned with what the Indians owned at the taking date and what it was reasonably worth at that time.[5]

Similarly, in another case involving land that on a stipulated title extinguishment date benefitted from good railroads and telegraphs, white settlement, and economic development, the award "plainly of record was enhanced because of . . . value-enhancing activities such as railroad building, town building, and cattle raising." *United States v. Fort Sill Apache Tribe*, 533 F.2d 531, 535, 209 Ct.Cl. 433, 440 (1976).

In *United States v. Northern Paiute Nation*, 393 F.2d 786, 183 Ct.Cl. 321 (1968), this court held that miners working on Indian lands received title as of the date of entry because the government later retroactively validated their title to that date. The miners, therefore, were viewed as imputed agents of the government, which was deemed to stand in their shoes. *Id.* 393 F.2d at 797, 183 Ct.Cl. at 340. Nonetheless, because of the use of an average valuation date for the entire tract later than the actual date of taking for these mining areas, "the Commission did not err by re-

fusing to deduct from the valuation of mineral areas the improvements 'made by others.' " *Id.* 393 F.2d at 796, 183 Ct.Cl. at 339.

The principle the government invokes—that it is not required to pay for the enhancement in the value of property it takes that is attributable to its own activity—is inapplicable here because the increases in the value of the plaintiffs' land between 1882 and 1905 were not the result of or attributable to governmental activity. The enhancement resulted from the activity of third persons—the settlers who entered the area, developed the farms, built the towns, and created the commerce of the region, and the companies that built and operated the railroads. The assistance the government provided for these activities through the Homestead Act, the grant of rights-of-way to the railroad, and perhaps other support, did not convert the third persons' activities into government actions within the meaning of the principle the government relies on.

The cases in which the government has been held not liable for increases in the value of condemned property that were attributable to the government's activity involved far different situations. Typically they were cases where the enhanced value resulted from the very project or program for which the government was acquiring the property. In the leading case of *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943), the Court held that the government was not liable for the increase in value of the property that resulted from the knowledge that it probably would be condemned as part of a reclamation project. Similarly, in *United States v. Cors*, 337 U.S. 325, 334, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949), the Court held that the just compensation the government was required to pay for a tugboat it had requisitioned during World War II did not include the increased value the government's need for such boats had created, because

---

**5.** The government argues that *Tlingit & Haida* is distinguishable because it was brought under a special jurisdictional statute. The statement quoted in the text, however, contains no such limitation and does not rest upon the special jurisdictional statute. Moreover, we there re-

lied on cases under the Indian Claims Commission Act and used the standard method of valuation as applied in those cases. In addition, we rejected the government's proposed "value to the Indians" approach.

as in the case of land included in a proposed project of the government, the enhanced value reflects speculation as to what the government can be compelled to pay. That is a hold-up value, not a fair market value. That is a value which the government itself created and hence in fairness should not be required to pay.

In this case, the enhancement in value is the result of the activities of private parties. It did not occur because Congress had announced a clear intention to take the land for public use. Cf. *Drakes Bay Land Co. v. United States*, 424 F.2d 574, 584, 191 Ct.Cl. 389, 408 (1970). It did not reflect speculation as to what the government would be compelled to pay the Indians for the extinguishment of aboriginal title. The enhancement reflected the conversion of the land to a higher and more valuable use by the railroads, farmers, and others who acted to reap directly the economic benefits of their activities, irrespective of any governmental plans for future acquisition.

The contention of the government is but another way of arguing that the plaintiffs' lands should be valued on the assumption that the aboriginal title was extinguished in 1882 rather than in 1905. To say that the 1905 value of land should be determined on the basis of the way the land existed in 1882 is to value it as of the latter date. The increase in value between those dates largely reflects the development of, and improvements on, the land in the interval. In the prior appeal we held that the plaintiffs' land should be valued as of the 1905 extinguishment date. Since the "value of land held by Indian title is the same as that held in fee simple" and "aboriginal title carries with it the same standard of valuation that would be applicable were the property held . . . by fee simple ownership" (*Tlingit & Haida Indians, supra*, 389 F.2d at 782, 182 Ct.Cl. at 136), the Indians' land must be valued as if they had fee simple ownership until 1905. The Commission properly determined that the value of the plaintiffs' land when their aboriginal title was extinguished in 1905 was $53,527,225.

## CONCLUSION

The order of the Indian Claims Commission is affirmed. The case is referred to the Trial Division to determine the amount of any gratuitous offsets to which the defendant may be entitled.

NICHOLS, Judge, concurring:

I concur in the judgment of the court and in its opinion. Defendant's contentions, first heard of, many of them, in this case, would if successful require us to apply a different and less favorable law to the instant claims than to others earlier adjudicated.

The case does illustrate how the artificial postponement of the taking date serves to put a few lucky Indian claimants in the enjoyment of windfalls not available to their brethren in the ordinary case. Before becoming involved in these cases I supposed, as best I can reconstruct it now, that the valuation date, when the claim had progressed that far, would be the date when the Indian was effectively put out of possession of the tract, and the white man had effectively put himself in possession. But it would be a date before the white man had done anything to alter the land, as the Indian had held it; nor would it be covered with railroads, highways, townsites, mines, and the other indicia of white occupancy. Thus no question of paying the Indian for the white man's railroads, mines, etc., could arise. I think most people would agree that such a valuation date would work out fairly as between white and Indian and also as between one Indian tribe and another. If there should be a case of paying the Indian for the railroad the white man had built on his domain, it ought to be an instance of misconduct: a punitive award.

I soon discovered that for varying reasons the date of title extinguishment or of the "taking" though long after the actual ouster date was being allowed to control the valuation date in many cases and to add greatly to awards. In some cases, as here, the doings of Congress in the premises make no other result possible. As the court points out in both our opinions, Congress

itself (a) determined that a formal title extinguishment was necessary, and (b) dawdled with the matter to such an extent that the land filled with towns, people, and railroads while the Indians had abandoned the land but remained ignorant whether the modest payment they had agreed to accept for their title would even be forthcoming.

In other cases the facts were different. "Taking" or "extinguishment" dates were often stipulated though Congress had done nothing relevant on the date stipulated and, sometimes, no one else had either. A date was picked out of the air, by methods of selection unknown, though it should have been apparent that every year between the date of Indian ouster and the chosen "taking" date would multiply the amount awardable. The Commission has eliminated actual physical structures; thus if the white man had built a bridge the Indian for award purposes does not get the bridge *qua* bridge, but he gets all the enhancement the bridge added to land anywhere in the tract. As a matter of fact, I do not find the elimination of the bridge itself logical, but it does serve cosmetic purposes.

I made myself somewhat of a *vox clamantis* in *deserto*, believing as I did that the corpus of the law of eminent domain was too valuable to justify the mayhem being committed upon it even in the worthy cause of relieving Indian poverty. I think I was somewhat in advance of defendant, which reviewed and reconsidered some of its positions as a result, I like to think, of what I had said. Defendant in this case did not ever fail to say what it should have said, so far as I know. It may be the Supreme Court will be receptive as it is free to correct past errors in a way not possible to us. Whether this case had come up early or late, with or without the precedents the court hurls at the defendant, it still would be as hard a case as could be devised, to bring into conformity the valuation date and the date of Indian ouster, and I just don't think it could have been done. The case should, however, have stood alone as a spot situation, instead of being all too typical of the way in which the gap between the date of Indian ouster and the date of title extinguishment is mercilessly exploited.

The entire body of doings under the Indian Claims Commission Act, 25 U.S.C. § 70a, will, I think go down into history as a prime example of how our affluent society worked during its prime when it seemed inconceivable it would ever run out of affluence.