**PUEBLO OF SANTO DOMINGO**

v.

**The UNITED STATES.**

No. 355.

United States Court of Claims.

April 22, 1981.

---

■■■■■■■■■■■

Thomas E. Luebben, Albuquerque, N. M., attorney of record, for plaintiff; Jeffery S. Taylor and Luebben, Hughes & Kelly, Albuquerque, N. M., of counsel.

D. Lee Stewart, with whom was Acting Asst. Atty. Gen. Anthony C. Liotta, Washington, D. C., for defendant.

Before NICHOLS, KUNZIG and BENNETT, Judges.

## ON PETITIONER'S OBJECTIONS TO THE ORDER OF THE TRIAL JUDGE PURSUANT TO RULE 13(C); PETITIONER'S MOTION TO VACATE OR MODIFY, ETC.; PETITIONER'S WITHDRAWAL FROM STIPULATION; DEFENDANT'S OBJECTIONS TO PETITIONER'S MOTION TO VACATE OR MODIFY, ETC.

KUNZIG, Judge:

This is a petition originally filed with the Indian Claims Commission (ICC) in 1951 pursuant to the Indian Claims Commission Act, 25 U.S.C. §§ 70 et seq. (1976). The petition alleged various trespasses by the federal Government on petitioner's alleged tribal lands.[1] On October 29, 1969, attorneys for both sides filed a stipulation with ICC that the lands had in fact been taken and that the Government was liable for just compensation. This represented a significant change in the theory of the case. ICC thereafter determined the extent of the lands taken and the taking dates in a decision of May 9, 1973. 30 Ind.Cl.Comm. 234 (1973). This court then affirmed the holdings of ICC on this part of the case in an interlocutory appeal decided April 16, 1975. United States v. Pueblo of San Ildefonso, 206 Ct.Cl. 649, 513 F.2d 1383 (1975). The case, along with many others, was transfer-

red to this court in an incomplete state upon the expiration of ICC's statutory life in 1978. See 25 U.S.C. § 70v (1976). No determination of the proper amount of compensation has yet been made.

This cause now comes before the court upon various motions and objections all of which center upon petitioner's request to withdraw from the stipulation of October 29, 1969. Petitioner contends that its then attorneys were not authorized to enter the stipulation and that, consequently, the stipulation should not be deemed to have binding effect. Our single response is that it is far too late in the day to make a motion of this nature.

The governing rules and principles are of the type we refer to as "hornbook law."

"An attorney employed for purposes of litigation has the general implied or apparent authority to enter into such stipulations or agreements, in connection with the conduct of the litigation, as appears to be necessary or expedient for the advancement of his client's interest or to accomplishment of the purpose for which the attorney was employed." 7A C.J.S. Attorney and Client § 205, at 341 (1980). "Such stipulations or agreements are binding on the client, without regard to the client's actual knowledge or consent." Id. at 341–342. "However, an attorney has no power to bind his client by an agreement or stipulation which he has not been expressly, impliedly, or apparently authorized to make." Id. at 342. "[U]nless he has been specifically authorized to do so [i. e., not merely impliedly or apparently], an attorney may not by stipulation or agreement, surrender any substantial rights of his client. . . ." Id.; see, e. g., Whitebird v. Eagle-Picher Company, 258 F.Supp. 308, 311 (N.D.Okl.1966) (emphasis supplied). "[T]here is a strong rebuttable presumption that the acts of an attorney are within the scope of his employment, in the absence of a showing of the knowledge of the adverse

---

1. Under the Indian Claims Commission Act, the ICC had jurisdiction over "claims in law or equity arising under the Constitution, laws, [and] treaties of the United States", "all other claims in law or equity, including those sound-ing in tort", and "claims arising from the taking by the United States ... of lands owned or occupied by the claimant". 25 U.S.C. § 70a (1976). The original petition herein sounded in tort. No taking had yet been alleged.

party of restrictions thereon." *Id.*, § 172, at 258 (emphasis supplied). "There is a rebuttable presumption that an attorney has authority from his client to enter into a stipulation which may amount to a surrender of [his] client's rights, unless [the] adverse party as well as [the] court is aware that the attorney is acting in direct opposition to his client's instructions." *Id.* at 259 n.84; *accord, Pacific Tel. and Tel. Co. v. Fink,* 296 P.2d 843, 847, 141 Cal.App.2d 332 (1956). *See also Navajo Tribe of Indians v. United States,* 220 Ct.Cl. ——, 601 F.2d 536, 539 (1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980).

Notwithstanding the foregoing limitations, "a client may be bound by a stipulation or agreement made by his attorney *without express authority*" where the client "fails to apply, seasonably, for relief from the stipulation." *Id.*, § 205, at 343 (emphasis supplied); *accord, In re Estate of Moss,* 248 N.E.2d 513, 516, 109 Ill.App.2d 185 (1969) (unseasonable to attempt to withdraw from stipulation seven months after entry). The rationale presumably lies in the rule of agency that, "An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it." Rest. (Second) of Agency § 94 (1958). Petitioner's attempt herein to withdraw from a stipulation entered nearly twelve years ago falls egregiously outside the permissible range of delay.

It has been said that, "Stipulations are looked upon with favor by the courts, since they tend to promote disposition of cases, simplification of issues and the saving of expense to litigants. The ends of justice are furthered by stipulations of settlement and the reluctance of courts to vitiate such agreements is founded in fundamental logic." *Moss' Estate,* 248 N.E.2d at 516.

Procedurally, the pending motions are governed by Rule 152(b) of this court's rules of procedure. *See also* Fed.R.Civ.P. 60(b). Rule 152(b) commands that the motion shall be made within a "reasonable time". We have stated that the Rule requires "diligence" upon the part of the moving party. *Andrade v. United States,* 202 Ct.Cl. 988,

996, 485 F.2d 660, 664 (1973), *cert. denied sub nom. Pitt River Tribe v. United States,* 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974). Again, the conclusion is unavoidable that petitioner has tarried far too long. Time is now especially of the essence since Congress has expressed its desire that the special Indian claims litigation be wound up by having terminated the operations of the ICC in 1978.

All other arguments raised by petitioner, although not directly addressed in this opinion, have been considered and found to be without merit.

Accordingly, after consideration of the submissions of the parties, without oral argument of counsel, all of petitioner's interrelated motions and objections are denied. Defendant's objections are sustained. The case will go forward in the trial division in accordance with the stipulation of October 29, 1969, the ICC decision of May 9, 1973, and this court's affirming opinion of April 16, 1975.

NICHOLS, Judge, dissenting:

The court is denying the motions without oral argument or receipt of any testimony. I dissent, respectfully, because I do not think we should make a decision on the grounds given without the facts we do not have and which a trial judge could provide. I favor a remand to obtain those facts. The panel has such a useful set of assumptions it does not need facts.

The Indians, through new counsel, want to withdraw from a stipulation made for them in 1969 by former counsel, that specifies that the United States took (at an unstipulated date) the tracts involved in this litigation. They would revert to the theory stated in their original petition that defendant committed trespasses on their land but did not take it. After the stipulation the Commission, using the stipulation as a basis, determined the taking dates of the various tracts. This court affirmed in *United States v. Pueblo of San Ildefonso,* [et al.], 206 Ct.Cl. 649, 513 F.2d 1383 (1975). In that case, the government appeal presented issues as to the date or dates of

taking applicable to the several tracts in litigation, but our panel did not have before it or consider whether any tract or tracts might in truth not have been taken at all.

That appeal was on an interlocutory order under 25 U.S.C. § 70s and no judgment was entered as a result of the affirmance, nor has there been one since. I assume, however, the decision is "law of the case" under *Turtle Mountain Band v. United States*, 222 Ct.Cl. ——, 612 F.2d 517 (1979) and *Northern Helex Co. v. United States*, 225 Ct.Cl. ——, 634 F.2d 557 (1980). The Indians may therefore reopen only if they can persuade the court that the decision "was clearly erroneous and works a manifest injustice." They say that they always wanted to limit claims to a trespass theory where possible and that their original counsel drafted the petition on that theory, yet in stipulating disregarded their express instructions. It is a seeming fact that many tribes have only belatedly recognized the pecuniary advantages of restricting their Indian Claims Commission taking claims to instances where a prior title extinguishment was unquestionable, whereas claimants in the earlier years of operations under the 1946 Act tended to try to maximize the extent of takings to maximize the cash thereby to be realized. This change threatens the early completion of our tasks under the Indian Claims Commission Act, 25 U.S.C. § 70 and ff, and I share the panel's irritation towards it. But really belated changes in the thrust of the litigation are objectionable on equitable grounds which do not apply with equal force if that is what the tribe wanted all along. This distinction the panel cavalierly ignores. A mere self-serving statement of what Indians now say they always wanted would not be entitled to much weight, but here they proffer the original text of the petition and would show their original instructions to counsel and they may have a prima facie case. I would not take any of this on faith. I would permit the tribe to withdraw the stipulation and vacate the vol. 206 decision only on clear and convincing evidence that their original position was as alleged, that they communicated it to counsel in his instructions, that he violated the instructions without notice to them, and that they took timely action when they learned what he had done.

The Indians charge serious misconduct and conflict of interests on the part of their former counsel. Misconduct on the part of its trial bar is always a proper concern of a court and this is doubly true in the case of Indian litigants who are supposed to lack the capability to protect or perhaps even perceive their own interests vis-a-vis their counsel, and to monitor him where a conflict exists. The panel is not interested in finding out whether misconduct occurred. Presumably it knows by superrational intuition that the charges are unfounded. It is true that such charges have been a commonplace accompaniment of efforts to change the thrust of a tribal claim. Our Indian litigation bar is or perhaps was made up of upright persons and we have to make every reasonable presumption in their favor when misconduct charges lack specifics and are simply part of the thunder and lightning coming with a charge of front. Doubtless we must look for substantiation and specificity before we even investigate.

Unfortunately the machinery of the Indian Claims Commission Act is such as to generate conflicts of interest. One of many such situations is the one asserted here, *i. e.*, the attorney's interest, but not the tribe's is to effect a judicial sale, as it were, of tribal land at values of some historic past date, not of the present, to be set by the Commission, whether or not the Indians may in reality ever have had their title extinguished except by the ICC proceeding itself. One prediction I make with confidence, is that attorneys' conflicts of interests and the measures required to cope with them will loom larger in future litigation than they have in the past. I note that only recently the Supreme Court has refused to consider an equal protection issue in a case it had accepted by certiorari, and remanded, because it perceived *sua sponte*, a conflict of interest between counsel and clients. It was a criminal case, counsel was paid by the defendant's employers, and the Court be-

lieved he may have been guided in litigation strategy by the employer's interest. *Wood v. Georgia*, —— U.S. ——, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). One conflict long tacitly ignored in ICC cases is that the counsel's interest on the usual contingent fee basis turns only on the amount of award to be extracted from defendant; yet the tribe's interest is not only in the amount of the award, but also in minimizing what land title or claim thereto it has to give up, which may be substantial. Thus for example, a million dollar award may be better for counsel, but worse for the tribe, compared to a half million, if the former operates to extinguish Indian title to substantial tracts by virtue of 25 U.S.C. § 70u, while the latter does not. If the tribe thereby retains title to lands worth $500,000 or more, it gains by the smaller award. The Supreme Court in *United States v. Santa Fe Pacific Railroad*, 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941), sets forth the canon that received general lip service in ICC cases, that any alleged extinguishment of Indian title not the result of express congressional action "cannot be lightly implied." This was not always easy to implement where the Indians were expelled *de facto* but not *de jure*, and instances have occurred where awards were made and title extinguished by judgment where there was no expulsion even *de facto*. The tendency was to think if the Indians were alleging a tract was taken, no harm could follow from accepting their view. The right kind of Indian counsel are well aware of this kind of problem and are exceedingly careful their clients know of everything done, and have given well informed consent. I think Indians who allege attorney misconduct of this kind are entitled to have the fact at least mentioned in the decision throwing them out of court, are entitled to a hearing if they display a moderate amount of corroboration, and are entitled to corrective action, the law of the case rule notwithstanding, if they establish by clear and convincing evidence the misconduct actually occurred.

There is a remarkable parallel between the facts of this case and the instance in 1957 when new counsel saved the famous Sioux claim for the Black Hills taking when it was gasping on the ropes. On November 7, 1956, this court published a decision, *Sioux Tribe of Indians v. United States*, 146 F.Supp. 229, D.C., which affirmed an ICC decision denying the Black Hills claim, with others, in toto. The opinion was by Judge Laramore, and all the other judges concurred. Counsel for the Sioux was Ralph H. Case, soon after deceased. Under date of October 4, 1957, *i. e.*, almost a year later, new counsel filed a motion for rehearing to vacate the November 7, 1956, affirmance, and to remand to the ICC for a full and complete hearing and disposition on the merits. The motion relied on allegedly incompetent legal representation by Mr. Case, resulting in the tribal claims being determined on the basis of a distorted and empty record. Specifically, they said Mr. Case, unknown to his clients—

(a) advised government counsel in secret he would drop certain claims,

(b) presented the claims that remained on an erroneous and untenable legal theory,

(c) urged a standard for measuring damages which the courts have always rejected,

(d) volunteered concessions contrary to fact,

(e) failed to conduct research, and

(f) did not prepare properly for trial.

The motion also faulted the ICC for not using its own investigative resources which, the movants said, were created in anticipation that the adversary system would not always protect the Indians. The movants said that in hearing the appeal, this court must have perceived that the Sioux were not competently represented.

The government opposition stated that the tribe continued Mr. Case as counsel after it could not but have observed his conduct at the trial, and for two years after the ensuing adverse ICC decision of April 5, 1954; the first expression of dissatisfaction by the tribe was almost a month after this court's decision of November 7, 1956. The

government brief in opposition also cited a long array of decisions of this court in which defendant was not allowed to reopen cases lost because of the kind of counsel's error imputed to Mr. Case.

It is easy to see what our present panel, with its incantation of "hornbook law," would have done with new counsel's egregious set of allegations and assertions, and how overwhelming it would have considered the government response to be.

This court as then constituted cannot be accused of reacting in haste or irritation. It withdrew its decision, though only after it had been published in F.Supp., where it still may be read as an interesting relic. On November 5, 1958, it vacated its decision and remanded the case.

The order, signed by Chief Judge Marvin Jones, shows that the court did not undertake itself to pass on the sufficiency of the reasons assigned in the motion. The new counsel were not required to, and did not, supply affidavits or other documents in support. The order reads that the motion to vacate the judgment and to remand the case is granted to the extent the case is remanded for "a determination by the said Commission as to (1) whether the claimant Indians are entitled on the basis of statements made in support of the above motions to have the proof in this case reopened, and (2) if so, to receive the additional proof and * * * reconsider its prior decision in this matter." That is in essence the procedure I proposed here, that the panel rejected, i. e., that our trier of fact should, subject of course to our review, pass on the sufficiency of statements made in support of the motion or motions.

The 1958 order was unpublished and apparently there was public confusion what had happened to the case, though counsel knew it was back at the ICC. By a "summary of proceedings," 182 Ct.Cl. 912 (1968), we published a notice of what we had done 10 years before and where the case was. While this court did not spell out its reasons, it would appear by its actions to have taken into account the implicit major premise of the motion: that in the case of Indian litigants the ICC and this court were required not to visit on Indians the consequences of defective representation or attorney misconduct, which under the normal operation of the adversary system would be fatal to a claim. It was not necessary to spell this out to the judges of that day. This factor the panel here has wholly failed to take into account. There is somewhat of a presumption that Indian claimants are not competent to look after their own interests and the court must look after them. If the Pueblo of Santo Domingo is different, the panel has done nothing to establish the fact.

The Indians undertook to explain why they waited from 1969 to 1980 to complain about the stipulation. The panel by ignoring the explanation presumably holds it is inadequate, the function we assigned to the trier of fact in the *Sioux* case. I would have cautioned the Indians to make their explanation a good one. The panel rightly says that the motions are under our Rule 152 and the applicable standard in passing on such a motion is whether the party seeking relief has acted within a reasonable time, and that "diligence is required." *Andrade v. United States*, 202 Ct.Cl. 988, 996, 485 F.2d 660, 664 (1973), *cert. denied sub nom., Pitt River v. United States*, 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974). That case involved a compromise settlement the ICC approved, but which dissident Indians wished to attack. They had attacked it before the ICC. They wanted an appellate review of the approval decision before this court but they were inordinately dilatory in asking for it. We viewed the petition as an "independent action" under the last part of Rule 152(b), the only possible way we could have jurisdiction at all. We did not need any fact finder to pass on the motion because we had the full fact findings of the ICC. We knew the dissidents had alleged to the ICC, years earlier, the same acts of attorney misconduct they charged here. Thus we needed no further fact finding. The case is certainly not authority, as it is used, for erecting a kind of irrebuttable presumption that a lapse of time, 11 years or any other, is so excessive that no fact

finding is necessary and no explanation will be listened to.

I suppose I will be charged with being soft on Indian claims and with wishing to prolong Indian litigation. Neither is my intention. The panel refers to the desire of the Congress that the Indian claims litigation be wound up. The Congress also desired that all litigable pre-1946 claims be disposed of under the 1946 Act, so it would not have to deal again with the importunities of Indian claimants, as before 1946 it had to do. If the panel decision stands, the Indians may, if they are sincere, decide to forgo the valuation phase of the case and allow their petition to be dismissed. The court cannot prevent their making that election, though it can dismiss with prejudice. We all know that a dismissal with prejudice means little in Indian litigation. Indians, like the Sioux, lose with prejudice over and over again, and still they return. When the Indians are back on the doorstep of Congress demanding further legislative relief, Congress may want to know why the ICC and ourselves have not heard the importunities of the Indians, found the facts, and decided what relief is appropriate on the basis of facts, not arbitrary irrebuttable presumptions. Thus I predict that the panel may well prolong Indian litigation more than my solution would have done. Frankly, I think it unlikely that pre-1946 Indian claims will be finally laid to rest in the lifetime of any present members of the court, say nothing of new ones coming along. The 1946 Act was not very successful as an appeaser of Indian discontent, or as a solution to their social problems, but as a breeder of costly and prolonged litigation, it has been a triumph beyond anyone's fondest hopes. I think the panel and I might allow one another credit for both desiring to lay this hydra-headed monster in its grave as soon as it can decently and lawfully be done. It is easier to start something like this than stop it, however. In this instance, I respectfully differ with the panel as to the means.

What we have here is a decision possibly within the court's discretionary power, for the guidelines on exercise of Rule 152 authority are few and not specific. Still the decision in its unwisdom is "an exercise of *raw* judicial power" in the deathless words of Justice White, dissenting in *Roe v. Wade*, 410 U.S. 113, 222, 93 S.Ct. 705, 763, 35 L.Ed.2d 147 (1973). I emphasize the word "raw." To end with another quote, the prophet Job lamented: "Would that mine enemy had written a book." This court, like other courts, is not entirely without enemies, and I do not know anything we could say or do that would give them more satisfaction than the panel opinion herein.