# DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION OF the STATE OF MONTANA

v.

## The UNITED STATES.

### No. 46–80C.

United States Claims Court.

March 14, 1983.

Donald A. Garrity, Helena, Mont., for plaintiff; Garrity, Keegan & Brown, Helena, Mont., of counsel.

Linwood C. Wright, Jr., Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

LYDON, Judge:

In this action, plaintiff seeks reimbursement from the United States of amounts it had to pay a third party, arising out of a contract between plaintiff and the third party, as a result of a State court judgment. Plaintiff contends that, since this adverse judgment resulted solely from the government's breach of its obligations under a contract between plaintiff and the government, a provision in this contract, purporting to limit the government's liability under the contract to only 50 percent of any such payment, is inapplicable.

### I.

This case arises out of a "Project Agreement," or contract, entered into by plaintiff, and the United States Soil Conservation Service (Service) on May 1, 1970. The project agreement was entered pursuant to the Watershed Protection and Flood Prevention Act, 16 U.S.C. Sec. 1002 (1972), and enabled the Federal Government to cooperate with the State of Montana in preserving, protecting and improving the State's land and water resources.

The purpose of this particular Project Agreement or contract was to rehabilitate and enlarge an existing State-owned irrigation system in Montana. This required the construction and replacement of pumps located along the Yellowstone River in Montana, and the building of some new relift stations. Under the contract, the State agreed to engage a contractor to build the various irrigation pump stations along the river and to provide 50, percent of the cost of constructing the pump stations. In exchange, the Service agreed to design and prepare plans and specifications for the construction sites and also to pay 50 percent of the construction costs of the planned improvements.

The Service designed the pump stations and prepared the plans and specifications. The plaintiff then issued an invitation for bids to construct the pump stations according to the Service plans and specifications. Plaintiff awarded the Sornsin Construction Company (Sornsin) the contract on the basis of its low bid. During the course of performing the contract, Sornsin encountered difficulties which it attributed to the Service plans and specifications. Sornsin presented several claims for equitable adjustments to plaintiff due to the increased costs incurred as a result of alleged faulty plans and specifications. All of Sornsin's equitable adjustment claims were ultimately denied by plaintiff's contracting officer, a State official.[1]

---

1. As to one of Sornsin's equitable adjustment claims, the contracting officer initially approved the claim because it appeared to him, as well as to Service personnel who were advising

Sornsin then initiated an action in a Montana State court seeking damages from plaintiff for breach of contract. After a lengthy jury trial, Sornsin received a damage award. This award was later upheld, for the most part, by the Supreme Court of the State of Montana. *Sornsin Constr. Co. v. State of Montana,* 180 Mont. 248, 590 P.2d 125 (1978) and Sornsin, by an amended judgment, was awarded damages of $320,-984.05.

The United States thereafter paid plaintiff one-half of the State court judgment, or $160,492.02, pursuant to Clause E 5 of the contract between plaintiff and the Service. Clause E 5 reads as follows:

E. It is mutually agreed that:

\* \* \* \* \* \*

5. Additional funds required as the result of a decision of the Contracting Officer on a contractor's claim or a judgment as a result of a lawsuit brought by the contractor will be provided in the same ratio as construction funds are contributed under the terms of this agreement; the Service will not contribute additional funds where a judgment of a court is based upon a breach of contract by the Contracting Local Organization [plaintiff]; the Contracting Local Organization has failed to discharge its responsibilities under this agreement or the resulting contract; the State Administrative Officer has not approved the decision of

the Contracting Officer; the State Administrative Officer has not approved the plans for and defense of the lawsuit; or the Contracting Local Organization has not exercised its right of appeal when requested to do so by the Service. In no case will the Service contribute additional funds for payment of attorney's fees.

Plaintiff brought this action against the United States in the United States Court of Claims to recover the remaining 50 percent of the judgment, or $160,492.03, which plaintiff paid Sornsin pursuant to the State court judgment, plus $31,855.22 for attorney's fees plaintiff incurred in defense of Sornsin's action in the State courts.

█ Defendant thereafter moved for summary judgment on two grounds: (1) that the Court of Claims lacked jurisdiction because the Project Agreement between plaintiff and the Service was not a "contract" within the purview of the Tucker Act,[2] and (2) that the Service did not violate its contractual obligations. By order dated March 6, 1981, the Court of Claims denied defendant's motion for summary judgment holding that the Project Agreement constituted a contract in the traditional sense and thus came within the pale of the Tucker Act. *Department of Natural Resources and Conservation of Montana v. United States,* 227 Ct.Cl. 552 (1981). In remanding the case to the Trial Division for further proceedings, the Court of Claims stated in pertinent part as follows:

---

the contracting officer, that the site conditions differed from those indicated on the plans and specifications. However, the Service National Construction Engineer in Washington, D.C. subsequently counseled the State contracting officer to reverse his decision and the claim was thereafter denied by the contracting officer.

2. Defendant raises this same jurisdictional argument in its brief to this court. This matter was fully discussed in the March 6, 1981 order of the Court of Claims. *Department of Natural Resources and Conservation of Montana v. United States,* 227 Ct.Cl. 552, 553–54 (1981). It is properly the law of case and thus dispositive of defendant's argument. *See* 1B *J. Moore, Moore's Federal Practice,* Para. 0.404 (2d ed. 1982). *See Connolly v. United States,* 1 Cl.Ct. 312 at 321 (Cl.Ct.1982) (KOZINSKI, J.), as to

the precedential nature of Court of Claims decisions generally. There is absolutely no basis for departing from the prior holding of the Court of Claims on this issue in this case since the holding was not plainly wrong nor does the holding work a manifest injustice. *Compare, Raylaine Worsteds, Inc. v. United States,* 137 Ct.Cl. 54, 58, 146 F.Supp. 723, 726 (Ct.Cl.1956). The holding of the Court of Claims on the jurisdictional issue was intended to be determinative of that issue in this case; no evidence was produced at trial which even suggests a different holding is justified; no contrary decision of law relative to said issue has since become controlling authority; and the holding is not clearly erroneous. *See United States v. Turtle Mtn. Band of Chippewa Indians,* 222 Ct.Cl. 1, 7–8, 612 F.2d 517, 521 (Ct.Cl.1979).

In refusing to pay the remaining monies that the plaintiff paid pursuant to the judgment in the suit against it by the contractor, the government relies on the provision of the agreement that obligates it to pay only one-half of '[a]dditional funds required as a result of . . . a judgment as a result of a lawsuit brought by the contractor.' It asserts that this provision limits its liability for any alleged expenses the plaintiff incurs as a result of a judgment in a lawsuit by the contractor to 50 percent of that judgment. The plaintiff responds that that provision does not apply where, as here, the judgment itself resulted from the government's breach of the contract. The plaintiff asserts that in that situation it may recover from the government its total damages resulting from the breach even though those damages resulted from the judgment.

The meaning of the 50 percent judgment clause is unclear and difficult to determine. The clause itself is ambiguous, and other provisions of the contract provide little assistance in interpreting it. In these circumstances we conclude that parol evidence regarding the negotiation of the contract and the intention of the parties might aid in construing the provision. Moreover, if it were held either that the Service had not breached its obligation under the contract to furnish plans and specifications or that, even if there had been such a breach, it was not the cause of the plaintiff's judgment liability to the contractor, there would be no need to interpret the 50 percent judgment provision. Accordingly, we decline at this time to decide whether the government complied with its contractual obligation by paying the plaintiff 50 percent of the amount the plaintiff paid to its contractor pursuant to the State court judgment. [227 Ct.Cl. at 554–55.]

Following trial, on remand, the parties submitted proposed findings of fact and briefs.

The initial issue confronting the court is whether Clause E 5 is for application under the facts of this case. Defendant maintains that Clause E 5 limits its liability for any expenses plaintiff incurs as a result of a judgment in a lawsuit by a contractor against plaintiff to 50 percent of that judgment. Plaintiff counters by arguing that Clause E 5 does not apply where the judgment in question resulted from the government's breach of its contract with plaintiff. If plaintiff's position is adopted, then a subsidiary issue, or issues, must be addressed.

Defendant argues that the Service did not breach its contract obligations to plaintiff; and further that even if it did breach such obligations, these breaches were not the cause of plaintiff's judgment liability to Sornsin. Plaintiff responds that defendant is precluded from relitigating the factual issues previously litigated as decided by the State courts which found that the Service's plans and specifications were defective and that such deficiencies were the direct and proximate cause of the plaintiff's judgment liability to Sornsin. This subsidiary issue, if reached herein, would be whether defendant should be precluded from relitigating factual liability issues previously decided by the courts of the State of Montana.[3]

Assuming, *arguendo*, that collateral estoppel is no bar, it would then be necessary to decide whether defendant, on the record now before the court, breached its contract obligations to plaintiff and that said breach was the cause of plaintiff's judgment liability.

For reasons which follow, it is concluded that Clause E 5, as it pertains to the government's effort to limit its judgment

---

3. The court in its order, dated March 6, 1981, denying the government's motion for summary judgment, *Department of Natural Resources and Conservation of Montana v. United States, supra,* 227 Ct.Cl. 552 (1981), did not mention the possible application of the doctrine of collateral estoppel as a bar to further action in this court on the factual issues of liability. In their briefs before the Court of Claims neither party mentioned the applicability of the doctrine of collateral estoppel as barring the relitigation of factual liability issues by defendant. That issue surfaces here for the first time.

liability, is ambiguous, and since trial has failed to disclose in a significant manner the intent of the parties from sources outside the parameters of the pertinent language of Clause E 5, in the form of parol evidence, the ambiguity must be construed against the government as the drafter of said clause. Further, the government is barred from relitigating the factual liability issues which resulted in the state court judgment by the doctrine of collateral estoppel.

## II.

The threshold issue in this case concerns the construction and interpretation to be given Clause E 5. As indicated earlier, the Court of Claims, stated that "[t]he meaning of the 50 percent judgment clause [Clause E 5] is unclear and difficult to determine," and that "[t]he clause itself is ambiguous." In such circumstances, the Court of Claims, concluding "that parol evidence regarding the negotiation of the contract and the intention of the parties might aid in construing the provision," remanded the case to the trial division to see if any such evidence existed. *Department of Natural Resources and Conservation of Montana v. United States, supra,* 227 Ct.Cl. at 555.

### A. *Law Of The Case*

In their briefs, both plaintiff and defendant agree that the holding of the Court of Claims that the 50 percent clause is "ambiguous" is the "law of the case." Defendant, however, contends that the court is not now precluded from disregarding or correcting the prior holding of the Court of Claims since its conclusion that the 50 percent

clause was ambiguous is "plainly wrong" and thus beyond the pale of the law of the case doctrine.

■ It is generally said that under the "law of the case" doctrine a legal issue previously determined by the same trial court or an appellate court in the same case is binding on the trial court throughout the case. 1B *J. Moore, Moore's Federal Practice,* Para. 0.404 (2d ed. 1982). Defendant, however, seeks to avoid the binding effect of this doctrine by arguing that the Court of Claims' decision, that the 50 percent clause is ambiguous, was "plainly wrong" and, therefore, not binding on this court, citing *Raylaine Worsteds, Inc. v. United States,* 137 Ct.Cl. 54, 58, 146 F.Supp. 723, 726 (Ct.Cl.1956).

■ Although it is a recognized exception to the "law of the case" doctrine that a court is not compelled to adhere to the law of the case where the decision was "plainly wrong," defendant has failed to persuade that the ambiguity holding of the Court of Claims was "plainly wrong."[4] The "plainly wrong" standard, which has also been defined as a "clearly erroneous" test, is a very stringent one and applies only in "exceptional circumstances." *Northern Helex Co. v. United States,* 225 Ct.Cl. 194, 201, 634 F.2d 557, 562 (Ct.Cl.1980); *United States v. Turtle Mtn. Band of Chippewa Indians,* 222 Ct.Cl. 1, 7, 612 F.2d 517, 521 (Ct.Cl.1979). Moreover, to fall within this exception, a "strong showing of clear error" is required; mere doubt or "mere suspicion of error, no matter how well supported, does not warrant reopening an already decided point."

---

4. In support of its assertion that the Court of Claims' decision was "plainly wrong," defendant cites *Webco Lumber, Inc. v. United States,* 677 F.2d 860, (Ct.Cl.1982), for the proposition that a disclaimer of liability provision should be interpreted according to its plain and ordinary meaning. Defendant looks on the *Webco Lumber* decision as a significant ruling subsequent to the March 6, 1981, ambiguity determination of the Court of Claims which constitutes another exception to application of the law of the case doctrine. *See* note 2, *supra.* The *Webco Lumber* case, however, is completely inapposite from the instant case. *Webco Lumber,* unlike the instant case, involved a crystal clear

disclaimer of warranty for inaccurate timber "estimates" of quantity. The Court of Claims in *Webco Lumber* found the contractual provisions in question to be clear, express and unambiguous. Here, by contrast, the clause in question does not, by clear, express and unambiguous terms, exculpate the government from full liability where its breach was the sole cause of the contractor's judgment against the state. It was because Clause E 5 was ambiguous that resort to parol evidence was mandated by the Court of Claims. The *Webco Lumber* holding does not constitute a contrary decision of law that is controlling on the ambiguity issue in this case. *See* note 2, *supra.*

*Northern Helex Co. v. United States, supra,* 225 Ct.Cl. at 201, 634 F.2d at 562; *see also United States v. Turtle Mtn. Band of Chippewa Indians, supra,* 222 Ct.Cl. at 8, 612 F.2d at 522.

In this case, no such "strong showing of clear error" has been made. Defendant first argues that Clause E 5 is clear and contains no hidden meanings. Defendant next contends that plaintiff's interpretation of the clause is unreasonable since the clause was clearly intended to limit the government's liability, even where the government's breach was the cause of the judgment being rendered against the plaintiff. The simple answer to defendant's first assertion lies in a reading of Clause E 5. The clause, in question, does not by its express terms limit the government's liability where the government's breach causes a judgment to be rendered against the contractor.

More importantly, the Court of Claims, in its prior holding, failed to view the pertinent language of Clause E 5 as unambiguous. As matters now stand defendant's position is that its reading of the clause shows it to be unambiguous and therefore the prior holding of the Court of Claims that the language of the clause in issue was ambiguous was "plainly wrong." Were the matter before the court for the first time, such an argument by defendant might be persuasive, but under existing circumstances defendant's strong disagreement with the prior interpretative holding of the Court of Claims does not meet the "plainly wrong" or "clearly erroneous" test necessary to disregard the law of the case doctrine in this case.

 Defendant's second contention is likewise without merit. Given the absence of clear, express and direct language limiting the government's liability in supplying defective plans and specifications, it was quite reasonable for the plaintiff, in agreeing to Clause E 5, to assume that the government would be fully responsible for providing accurate plans and specifications.

 It is well established that when the government provides plans and specifications for a construction project it warrants that those plans and specifications are free from defect. *United States v. Spearin,* 248 U.S. 132, 136–37, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918); *Laburnum Construction Corp. v. United States,* 163 Ct.Cl. 339, 349–50, 325 F.2d 451, 457–58 (Ct.Cl.1963). Plaintiff had a right to rely on the adequacy of the plans and specifications supplied by the government and was reasonable in believing that said plans and specifications were free from defects. Accordingly, it was reasonable for plaintiff to view the 50 percent clause as embracing only those judgments which were not due solely to the government's breach of its obligation to furnish plans and specifications free from defects. There is nothing in Clause E 5 which relieves the government from full liability for such damages as flow from defective plans and specifications. *See Ithaca Gun Co. v. United States,* 176 Ct.Cl. 437, 442–43 (1966). Thus, a reasonable reading of Clause E 5 by a contractor such as plaintiff would incorporate therein the well-established proposition discussed above that if the government supplies defective plans and specifications which generate damages to a contractor, the government will be fully liable for said damages. It is not only reasonable, but it is required that where the government intends to exculpate itself from liability for its breach of contract, it must manifest that intent in clear, direct and express language. *See Benjamin v. United States,* 172 Ct.Cl. 118, 138, 348 F.2d 502, 516 (Ct.Cl.1965); *Freedman v. United States,* 162 Ct.Cl. 390, 403, 320 F.2d 359, 366 (Ct.Cl.1963); *Ozark Dam Constructors v. United States,* 130 Ct.Cl. 354, 359–60, 127 F.Supp. 187, 190 (Ct.Cl.1955); *George A. Fuller Co. v. United States,* 108 Ct.Cl. 70, 96–97, 69 F.Supp. 409, 415 (Ct.Cl.1947); *Mohawk Drilling Co. v. McCullough Tool Co.,* 271 F.2d 627, 632 (10th Cir.1959). *Cf. Wells Bros. Co. v. United States,* 254 U.S. 83, 41 S.Ct. 34, 65 L.Ed. 148 (1920). This is all the more compelling where, as here, the government is the drafter of the clause in dispute. The government failed to do so in

drafting the clause in issue and thus created the ambiguity in question. Contrary to defendant's contention, plaintiff's interpretation of the 50 percent clause is clearly reasonable.

The prior holding of the Court of Claims that the 50 percent clause is ambiguous, cannot be said to constitute "sufficiently gross and flagrant" error which would justify rejection of the law of the case doctrine. *See Three Affiliated Tribe of the Fort Berthold Reservation v. United States,* 204 Ct.Cl. 831, 835 (1974). The 50 percent provision of Clause E 5, under the circumstances of this case, must be deemed ambiguous on its face.

### B. *Parol And Extrinsic Evidence*

Having concluded that the 50 percent clause is ambiguous, the court must now ascertain, if it can, the intent of the parties from outside sources. *Cities Service Oil Co. v. United States,* 118 Ct.Cl. 113, 125 (1950). Unfortunately, the evidence offered by the parties at trial was of little help to the court in its quest for aid in ascertaining the intent of the parties relative to the meaning to be ascribed to the 50 percent clause.

Prior to entering into the contract, representatives from both the Service and the State of Montana met and discussed the proposed contract. As a general rule, at pre-contract award meetings with contractors, the Service representatives would discuss the provisions of the contract and the fact that it was a cost-sharing endeavor. In this case, there is doubt as to whether Clause E 5 was the subject of discussion between Service personnel and State personnel during the negotiation stages of the contract. It is clearly established, however, that to the extent the clause was discussed it was done in a general fashion as part of an overview of all contract provisions and not as a special and individualized scrutiny of a particular clause singled out for special consideration.

Minutes of pre-contract negotiations do not indicate any discussions relative to Clause E 5.[5] The testimony of Orrin Ferris (Ferris) the State's Contracting Officer, indicates rather strongly that State officials, when entering into the contract in question, were totally unaware of the interpretation defendant now advances relative to the 50 percent clause. Ferris testified that he had no recollection of any reference to or explanation of Clause E 5 in either of the two meetings with Service personnel prior to execution of the contract, and that, as far as he recalled the clause was not an issue at all. The weight of Ferris' testimony is not diminished by the testimony of Charles Doud (Doud), a Service contract specialist. Doud testified that it was Service policy to discuss contract clauses and that he had "to believe that [Clause E 5] was explained," at the negotiation meeting of May 1, 1970, although he could not remember any specifics of any such discussion. Doud testified that there were no questions as to Clause E 5, and there were no negotiations relative to Clause E 5. Clause E 5 was, Doud testified, drafted by the Service and accepted by the State without discussion. Doud, in his testimony, was sure that the Service, in the negotiation stages, never discussed with State officials the possibility of the Service providing defective plans and specifications, and never discussed with State officials that portion of Clause E 5 which provided that if a judgment resulted from the State's breach of contract, the Service would not pay any part of the judgment. Finally, Doud impliedly agreed that there were no discussions as to the status of the 50 percent clause where the Service's breach of contract resulted in a judgment by the contractor against the State. Doud testified he did not remember anything of that nature being discussed and that such a situation never came up during the 12 years he worked with such project agreements.

5. The minutes of the May 1, 1970 meeting contain the following sentence: "Explanation was made of the percentage for the cost-share arrangements in the contract as outlined in the project agreement." This cryptic sentence offers no aid in trying to ascertain the intent of the parties. The minutes of an April 22, 1970 pre-contract negotiation meeting likewise disclose no discussion of Clause E 5 and offer no assistance relative to the search for evidence bearing on the intent of the parties as to the meaning of the 50 percent clause.

The testimony of Ferris and Doud support a finding that neither party considered in their negotiations leading to the contract in issue the question of whether the 50 percent clause applied in circumstances where the Service's breach of contract, supplying defective plans and specifications, directly resulted in a contractor's judgment against plaintiff.[6]

Defendant relies on the testimony of Doud, Fisher and Dooley for the parol and extrinsic evidence necessary to thwart the ambiguity holding reached previously. Such reliance is misplaced for none of these individuals was able to testify that they discussed the 50 percent clause with State officials in a manner that conveyed to these officials the interpretation that defendant now seeks to ascribe to the 50 percent clause. Further, the testimony of these individuals as to the government's intent in drafting the clause left much to be desired. The facts gleaned from their testimony were that Clause E 5 was a standard clause that had been utilized by the Service for a number of years; that the Clause was set forth in a Service manual, but that the manual explanation did not cover the intent position now taken by defendant; that the Clause, on the intent question now before the court, had never been litigated, challenged or questioned before; and that the Clause was supposed to be routinely discussed with all State officials prior to contract award, but this standard procedure never before included a statement that the 50 percent clause applied even where the Service breached the contract by supplying defective plans and specifications.

The record clearly indicates the defendant's intent that the 50 percent clause apply to a judgment against the State based on defective plans and specifications supplied by the Service was purely subjective. There is no evidence that this intent was objectively manifested to plaintiff or to other contractors who were awarded Project Agreements. There is no evidence that plaintiff, or any of its officials, were aware, or should have been aware, of the interpretation defendant placed on the 50 percent clause prior to contract award, or that plaintiff, or any of its officials knew, or should have known, of defendant's intent in drafting Clause E 5.

Defendant argues that to accept plaintiff's interpretation of the clause would render the clause worthless. This is not so. Under plaintiff's interpretation, the following rational outcomes would occur under different events. If plaintiff breached the contract and a judgment ensued because of it, the plaintiff would bear the entire cost. If defendant breached the contract by supplying defective plans and specifications, and a judgment ensued, defendant would

---

**6.** Testimony by other Service witnesses support this finding. James R. Fisher (Fisher) a Service contract specialist, testified that he never explained to State officials that if the Service supplied defective plans and specifications and a contractor received a judgment as a result thereof, the State would only receive 50 percent of the judgment the State paid the contractor under Clause E 5. Fisher also testified that he was sure the Service jointly reviewed all the clauses and provisions of the contract with State officials since it was Service practice to do so. Since it was standard practice to discuss and review contract clauses, he felt Clause E 5 must have been reviewed and discussed although he never stated as a fact that he remembered it being done, or what was discussed. William H. Dooley (Dooley), Service's Chief of the Procurement Management Branch, did not participate in the negotiations leading to execution of the contract in issue and had no contact with plaintiff's representatives prior to award. His testimony related to a generalized overview of Service project agreements throughout the United States, and the Service contract manual covering said agreements. His testimony related to the facts that Clause E 5 was a standard clause, had been used for a number of years, and was intended to be a cost-sharing clause relative to any judgment obtained by a contractor against the State. Dooley conceded that Clause E 5 had never been contested like it had in this case, i.e., the clause had never before been the subject of litigation as to the interpretation to be placed on the 50 percent clause. Indeed, he testified this case was the first time the clause had been challenged by anyone. Dooley testified that while the clause was never explained in the context of Service supplied defective plans and specifications, the Service's interpretation and explanation was a generalized one, i.e., that the Service would only cost share up to 50 percent.

bear the entire cost.[7] If both parties contributed to acts which resulted in a judgment, the parties would share the cost. This is a reasonable interpretation of the clause and places the cost burden where it belongs—on the negligent party. Under defendant's interpretation, an unwarranted cost burden is placed on the innocent party and the wrongdoer's cost burden is reduced.

■ In summary, the parol and extrinsic evidence presented by the parties fails to show that the parties mutually intended that the government's liability be limited to 50 percent of a contractor's judgment rendered against plaintiff, where said judgment resulted solely from the government's fault or breach. Therefore, the defendant must shoulder the burden associated with the holding that the 50 percent clause is ambiguous. Because the defendant drafted the clause, under the *contra preferentum* rule, the ambiguous 50 percent clause must be construed against the defendant. *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 323 F.2d 874 (Ct.Cl. 1963). Accordingly, it is concluded that the 50 percent provision in Clause E 5 does not limit the defendant's liability to only 50 percent of the contractor's judgment against the State when, as here, the defendant's breach of its contractual obligations was the sole cause of said judgment.

7. This approach properly reads into the contract the common law implied warranty rule that one who provides plans and specifications for a construction project warrants that those plans and specifications are free from defect. *See* Patten, *The Implied Warranty That Attaches To Government Furnished Design Specifications,* 31 Fed.B.J. 291, 292 (1972); *see also United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166, 136–37 (1918). Elimination of this implied warranty can only be achieved by express, clear, direct and unambiguous language in the contract. Further, one should not, if it can be avoided, read a clause, as defendant would have the court read the 50 percent clause, which serves to reduce defendant's full liability for its breach of contract. *See Freedman v. United States,* 162 Ct.Cl. 390, 403, 320 F.2d 359, 366 (Ct.Cl.1963).

8. While not raised by the parties, the contractual relationship between the State and the

## III.

Plaintiff contends that defendant is collaterally estopped from relitigating the issue of whether the Service breached its obligations under the contract by supplying defective plans and specifications, which were the sole cause of plaintiff's judgment liability to the contractor, because of the prior judgment by the Montana Supreme Court which actually and necessarily resolved and determined said issue in plaintiff's favor. Defendant argues that the doctrine of collateral estoppel is not for application in this case.

■ Embodied in the doctrine of collateral estoppel is the precept that "a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction cannot be disputed in a subsequent suit between the same parties or their privies * * *." *Southern Pacific R.R. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). Judicial evolution of the doctrine now embraces nonparties in circumstances where they could exercise control relative to the course of prior litigation which presented issues in which they had a direct financial or proprietary interest. *Montana v. United States,* 440 U.S. 147, 154, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979). Mutuality of parties is no longer required. *Monterey Life Systems, Inc. v. United States,* 225 Ct.Cl. 50, 61, 635 F.2d 821, 827 (Ct.Cl.1980).[8] Wheth-

Service and the contractual provision, Clause C 12, governing the rights and obligations of the parties when the State's contractor filed suit against the State provides a rational basis for viewing the Service as in privity with the State relative to said law suit for estoppel purposes. The actions of the State in defending against attacks on the Service's plans and specifications and the Service's participation in the planning for defending the lawsuit and its lack of disagreement with the nature, scope and theory of that defense at the time suggest rather strongly that the Service was acting in privity with the State relative to the litigation. Also the fact that the adequacy of plans and specifications prepared solely by the Service was the focal point of the State court litigation and the fact that the Service would be responsible, in whole or in part, under Clause E 5, for any resulting judgment for the contractor against the State further supports this view. Privity

er involving parties or their privies or non-parties, policy interests underscoring application of the doctrine of collateral estoppel have been stated as follows: "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions [footnote omitted]." *Montana v. United States, supra,* 440 U.S. at 153–54, 99 S.Ct. at 973–74.

It seems clear that whether collateral estoppel should be held to preclude redetermination of previously decided issues rests on the facts of each case. Thus defendant's efforts to view the various factors set forth in *State of Montana v. United States, supra,* as the mold or check list that must be filled or met in this case is misdirected.[9]

The applicability of collateral estoppel in this case involves a number of factors. First, are the issues in this litigation the same as those resolved against the State by the Montana Supreme Court? Second, have the facts and legal principles which led to the holding of the Montana Supreme Court changed in any significant manner? Third, did the Service have a direct financial or proprietary interest sufficient to require that it make full use of its right to control and participate in the State Court litigation at peril, at a later time, of being estopped from relitigating issues decided in the prior litigation? Fourth, did the United States, acting through the Service, have the right and a full and fair opportunity to participate in, influence and control the thrust, direction, theory and strategy of the State court litigation? And fifth, whether there are any special circumstances present in the case which justify the application or nonapplication of the doctrine of collateral estoppel?

As to the first factor, it is clear that the issues which defendant seeks to relitigate in this court are identical to the issues previously determined by the Montana Supreme Court. Defendant does not contend otherwise. *Compare, Monterey Life Systems, Inc. v. United States, supra.* For example, in the State court litigation, it was conceded by the Service, that the riverbed elevations shown on the plans and specifications differed from the actual riverbed elevations encountered during contract performance. This fact caused damage to the contractor. In defending against this claim, based on defective plans and specifications, the Service, through the State, argued that while the elevations were incorrect on the plans and specifications, the contractor as an experienced worker on the Yellowstone River should have expected the riverbed elevations to change from time to time. In essence, the State argued that an experienced contractor had no right to rely on the elevations set forth on the plans and specifications. The Montana Supreme Court rejected this defense stating that the law was established that a contractor can rely on matters set forth in the plans and specifications and need not, as argued by the State, verify them; it also stated that the State warrants and is responsible for the accuracy of its plans and specifications, citing *Carl M. Halvorson, Inc. v. United States,* 198 Ct.Cl.

---

between the Service and the State is also supported by the fact that although the Service was not a formal party to the earlier suit its interests were validly represented in that suit. *See* 1B *Moore's Federal Practice,* Para. 0.411(1), p. 1254 (2d ed. 1982).

9. The various factors which the Supreme Court discussed in *State of Montana v. United States,* 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979) were covered, either directly or by reasonable implication, by certain clauses of the contract between the Service and plaintiff.

*See* Clause 12, *infra,* and Clause E 5, *supra.* Under these clauses the Service had the right and the opportunity to control the litigation in every sense of the word. Further, the Service would be financially affected by any judgment rendered against the State. Because the Service chose not to exercise that right to the fullest extent, presumably because the State was properly handling the litigation in the best interests of the Service, should not serve to block activation of the principle of estoppel.

882, 461 F.2d 1337 (Ct.Cl.1972); *Farnsworth & Chambers Co. v. United States,* 171 Ct.Cl. 30, 34–35, 346 F.2d 577, 580–81 (Ct.Cl.1965); and *Foster Construction Co. v. United States,* 193 Ct.Cl. 587, 613–16, 435 F.2d 873, 887–88 (Ct.Cl.1970). Defendant, in its brief to this court, raises the very same issue previously decided by the Montana Supreme Court and seeks a redetermination that it need not respond in damages because of its defective plans and specifications since the contractor was "an experienced river worker" and "should have expected riverbed elevation changes" different from those shown on plans and specifications. Even if defendant were permitted to seek a redetermination of this issue, it would not prevail for the holding of the Montana Supreme Court was clearly correct as a matter of law. It would be inane to suppose that the riverbed elevations on the plans and specifications were furnished for no purpose. If the riverbed elevations were not intended to be meaningful and followed, there was no need to include them on the plans and specifications. *See Teledyne Lewisburg v. United States,* 699 F.2d 1336 at 1357 (Fed.Cir.1983).

 With respect to the second factor, none of the facts and legal principles which led to the holding of the Montana Supreme Court have changed in any significant manner. Defendant tries to counteract this conclusion in an oblique manner. Defendant suggests that had certain Service personnel been called to testify in the State court litigation, the State court jury verdict would have been substantially different. Parenthetically, the court, having read the transcript of the State court trial and the transcript of the trial in this case which contains the additional testimony on which defendant now relies, believes that had this testimony been given at the State court trial, the jury verdict most probably would not have been any different.

The record supports the conclusion that any failure to call these Service personnel as witnesses must rest with the Service. The record indicates the State sought out the Service for witnesses and assistance. It was the Service's plans and specifications which were under attack. The State had to rely on the Service in defending this attack since the State had nothing to do with the design or preparation of the plans and specifications. The facts of the State court defense rested with Service personnel. There is no evidence that the State refused to call as a witness any Service personnel specifically designated as a vital witness by the Service. One has only to read the October 31, 1975 memorandum of the conference between Service personnel, including its attorney, and State personnel, including its attorney, to see how dependent the State was on the Service to put forward those Service personnel as prospective witnesses who had knowledge and information germane to the issues to be tried. Defendant also suggests that the State proceeded on a different defensive theory than that propounded by defendant in this litigation. This is simply not so. See the discussion, *supra,* as to the riverbed elevations issue.

The record in this case shows that Service officials played a vital role in the preparation and planning of the defense to the contractor's suit. Following the service on the State of the contractor's lawsuit, the State promptly provided a copy of the same to the Service. On October 3, 1975, Robert O'Driscoll (O'Driscoll), a Service official wrote to Allen Chronister (Chronister), the State's attorney, scheduling a meeting relative to the contractor's suit. At this meeting, held on October 31, 1975, seven Service officials and four State officials, which included attorneys for the Service and the State, met to discuss the litigation. Chronister, at the meeting distributed copies of the latest amendment to the complaint filed by the contractor. At this meeting, those in attendance discussed the manner in which the suit should be defended. It was discussed, and concluded, that all Service personnel involved in the matter would be contacted or called. This judgment had to rest on the Service since they knew who the personnel were who drafted and designed the plans and specifications. In the discussion of Service personnel who could serve as witnesses, the Service, at this conference,

never mentioned the name of Paul Nylander (Nylander), who defendant now claims, was a vital witness not called at the prior trial. However, the record indicates that the attorney for the State contacted Nylander prior to trial to see if he knew anything the State could use in defense of the case. Since Nylander was not used as a witness by the State, it must be concluded that the State's attorney did not feel his testimony would be helpful. Nylander's testimony at trial in this case indicates similar testimony by him in the prior litigation would not, most probably, have altered the result.

The minutes of the October 31, 1975 meeting clearly indicate that the first mention of a theory of defense for the case came from Larry Jakub (Jakub), a Service attorney. Jakub conceded that a differing site condition may have been present as a result of changes in the riverbed, but he proffered the defense that a prudent and experienced contractor should have been aware of such changes, given the type of river involved. Robert Cummins (Cummins), another State attorney working on the case, concurred with this strategy, and concluded that this theory was the only possible position to take, and, therefore, would be the defense adopted by the State. This is precisely the defensive position the State had taken in the prior litigation and is the position defendant now advances in this litigation. Later at the October 31, 1975 meeting, Jakub advised Chronister (State) not to proceed on the basis that there was a "changed condition." Both State attorneys, Chronister and Cummins, concurred with Jakub in this regard.

In addition to formulating a defensive theory for the case, six of the seven Service officials in attendance at the October 31, 1975 meeting actively participated in a fact-gathering discussion with State officials regarding the lawsuit. Service officials often offered opinions as to the manner in which to present certain facts in a light most favorable to their interests. For example, O'Driscoll of the Service raised for discussion the problem of how the State would explain the contracting officer's reversal of his original decision to allow the differing site condition claim. At the close of the October 31st strategy session, both Service and State officials and attorneys agreed that all memos and correspondence concerning the case would be passed to State Attorney Cummins through Service attorney Jakub, with the attorneys acting as liaisons. Furthermore, after the adverse State court trial judgment, Jakub requested that the State appeal the Sornsin judgment to the Montana Supreme Court.[10]

In view of the above discussion, it is difficult to accept defendant's strong assertion that in this case "the United States was a virtual stranger to the Sornsin litigation * * *." *See Souffront v. Compagnie Des Sucreries,* 217 U.S. 475, 486–87, 30 S.Ct. 608, 612–13, 54 L.Ed. 846 (1910). Defendant's position, under the second factor, more properly reflects the view shared by most trial lawyers that if given an opportunity to retry the same case they would do a better job and thus obtain a more favorable outcome than was obtained as a result of the prior trial. Such a position has no bearing on whether the principles of estoppel should be activated.

■ As to the third factor, it is clear that the Service had a direct financial interest in the outcome of the State court litigation. Under Clause E 5, the Service agreed to provide additional funds to plaintiff as a result of a judgment emanating from a

---

10. In a footnote in its brief defendant suggests that the "defendant's contracting officer" did not approve the legal plans for the lawsuit and that plaintiff did not prove this fact at trial. The simple answer to plaintiff's failure to address this matter at trial is that defendant admitted in its answer to plaintiff's petition (complaint) (paragraph 13) that, the Service had approved the defense of the lawsuit by plaintiff. Moreover, in paying plaintiff additional funds because of the State court judgment, defendant also admitted that the appropriate Service official "had approved the plans for and defense of the lawsuit * * *." (*See* Clause E 5, *supra.*) Finally, the record in this case shows that the Service, not only approved the State's defense of the lawsuit, but actively participated in the planning and preparation of said defense.

lawsuit brought by the contractor against plaintiff. As a result, there was motivation for the Service to make sure its interests were fully protected in any such lawsuit. Indeed, Clause C 12, *infra,* was undoubtedly inserted in the contract between the Service and plaintiff to cover such a contingency. The Service therefore not only had the right to control the State court litigation (Clause C 12), but also the responsibility to do so since it had a financial stake in the outcome of said litigation. *See Starker v. United States,* 602 F.2d 1341, 1349–50 (9th Cir.1979). It should not be permitted to shirk this responsibility in the initial litigation and, if the initial judicial result is adverse, be allowed to relitigate again the very same issues involved in the prior litigation. To permit defendant to do so under such circumstances would be to encourage multiple lawsuits, tax judicial resources, and discourage reliance on judicial action by maximizing the possibility of inconsistent decisions, evils which the doctrine of collateral estoppel is designed to prevent. *See Montana v. United States, supra,* 440 U.S. at 153–54, 99 S.Ct. at 973–74.

 With respect to the fourth factor, it is clear that under its contract with plaintiff, defendant had the right and a concomitant full and fair opportunity not only to participate in the State court litigation, but also to influence and control the thrust, direction, theory and strategy of the State court litigation. Clause C 12 of the contract between the Service and plaintiff required plaintiff to:

Take necessary action to defend any lawsuit brought by the contractor against the Contracting Local Organization resulting from the contract. Submit in writing for the State Administrative Officer's approval, plans of the Contracting Local Organization for the defense of any such lawsuit prior to trial; permit the Service to participate to the extent it deems advisable in the preparation for and the trial of any such lawsuit; and exercise the right of appeal in any such lawsuit if requested to do so by the Service.

The above clause vested the Service with all the elements of control necessary to ensure that they had a full and fair opportunity to litigate and protect their interests in the State court suit. It is important to bear in mind that the State court litigation emanated from defective plans and specifications prepared by the Service. The only personnel who could properly defend against such a suit were those Service personnel who prepared the plans and specifications. Thus, the State had to look to the Service for help in defending the litigation. Since the Service would be ultimately liable for any judgment rendered against the State, and since the litigation arose solely out of the Service's breach of its contract with the State, there is a rational basis for concluding that the Service should have defended the suit brought by the contractor. *See N.L. and J.L. Terteling v. United States,* 167 Ct.Cl. 331, 340, 334 F.2d 250, 255–56 (Ct.Cl.1964). Defendant should not now be rewarded for not doing what it should have done in the first instance by being allowed to relitigate the same matters again, *i.e.,* given any bite at the litigation apple. There is no evidence in the record that at any time the State precluded the Service from exercising its contractual right to fully participate in the litigation.[11]

On the matter of control, defendant stresses the fact that the Service did not appear before the State court in any man-

---

11. Indeed, the State contacted the Service with respect to the matter of depositions scheduled by the contractor and sought the Service's assistance relative thereto, but the Service's attorney declined to be present at said deposition. Defendant attaches too much significance to the response of State attorney Alan Chronister that he had no legal help from the Service. This response indicated merely that the Service provided no amicus brief in the State court litigation nor any legal memoranda. However, legal strategy was discussed, as indicated previously, at the October 31, 1975 conference. Further, since there was, at the time preparations were made for defending the lawsuit and at trial, no complaint with the State's legal presentation, it is reasonable to conclude the State got no legal help because it did not need it.

ner, did not pay any attorney's fees or costs, and did not direct the State to appeal the adverse verdict rendered against the State. Defendant focuses on what the Service did not do and not on what it could have done. It is clear that the Service could have appeared before the State court, as the United States did in *Montana v. United States, supra,* had it desired to do so.[12] Clause C 12, *supra,* gave it the right to participate in the lawsuit "to the extent it deems advisable." As to attorney's fees, the parties agreed in Clause E 5 that "[i]n no case will the Service contribute additional funds for payment of attorney's fees." Thus, this factor is of little, if any, concern as to the matter of estoppel. However, it would appear from the record that costs were assessed and included in the final judgment figure of $320,984.05, of which the Service has already paid one-half to the State. As to the matter of appeal, the Service did "recommend" that the State appeal the adverse verdict, in much the same manner that the Service "recommended" that the contracting officer reverse himself as to whether the contractor encountered differing site conditions entitling it to an equitable adjustment.[13] The record in this case suggests that "recommendations" from the Service to plaintiff were "polite directions."

It is not unreasonable, on this record, to conclude that the United States exercised that degree of control and participation over and in the litigation that the Service deemed advisable. *See* Clause C 12. The Service during the preparation of the case for trial, during the trial, and on appeal, voiced no complaint with the State's handling of the case. Under the circumstances discussed above, this is deemed sufficient control for purposes of activating the principles of estoppel. Any other approach would encourage a party to shirk its right and obligation to participate fully in State court litigation involving issues in which it has a financial and substantive interest, in order to preclude application of the doctrine of collateral estoppel and thus permit it to relitigate those issues if the State court holding on those issues is adverse to said party. As indicated earlier, such an approach would run counter to the policy behind the doctrine of collateral estoppel by encouraging multiple lawsuits, draining judicial resources and maximizing the possibility of inconsistent decisions. *See Montana v. United States, supra,* 440 U.S. at 153–54, 99 S.Ct. at 973–74. One final observation seems in order here. A party would be encouraged to conceal its right to control and direct the prior litigation by an outward lackadaisical approach to the litiga-

12. Defendant also seizes upon testimony in the record of this case which suggests that the State made a motion to join the United States as an indispensable party. The circumstances surrounding this motion are so unclear and unusual as to require that little weight be accorded this matter. First, it is not clear whether the motion was written or oral. No copy of the motion was produced. Second, there is no evidence that the motion was ever served on the Service or the appropriate United States official, nor is there any evidence that any response to said motion was filed by anyone. Third, the trial judge, the testimony goes, in denying the motion, on a ruling from the bench, was said to observe "that if a party is indispensable, it would have intervened and if it doesn't intervene then it is not indispensable." The State attorney viewed the judge's approach as a "Catch 22" situation. He felt it "was basically a legal snafu of the District Court."

13. Defendant seeks to make something out of the fact that the Montana trial court by order ruled that the State could not introduce evidence relative to any claim by the contractor

based on the differing site conditions clause. This ruling ostensibly was based on Montana law which precluded an administrative official from reversing himself under circumstances such as were present in this case. *See* note 1, *supra.* It is to be noted that it was the Service which was responsible for the reversal by the contracting officer of his prior decision favorable to the contractor. More importantly, as indicated earlier, the question of differing site conditions was not an issue that the Service was going to litigate in the State court suit. Thus, the preclusion ruling by the trial court had no effect on the trial strategy planned by the Service and the State. The Service and the State conceded the riverbed elevations were inaccurate vis-a-vis the actual riverbed elevations encountered during trial. Instead, their trial strategy was to paint the contractor as an experienced river worker who should have known riverbed elevations and thus should not, and had no right to, rely on the elevations set forth in the plans and specifications.

tion, or in an effort to conserve on litigation expenses. It is not without some significance that the State under the contract had to bear all the legal expenses of the suit. (See Clause E 5.) This, perhaps, explains why the Service did not desire to file briefs with the court, etc., having assured itself that the State would fully protect its interests. There is no persuasive and reliable evidence that the State in the prior litigation failed to fully protect the interests of the Service. The judgment the contractor received was the result of Service action, i.e., defective plans and specifications, and not the result of inadequate legal actions or representation by the State.

■■■ The fifth factor involves the question of whether special circumstances are present in this case which bear on application of estoppel. The present situation is somewhat unusual and can, taking a broad approach, be viewed as bordering on "offensive use of collateral estoppel," i.e., plaintiff is seeking to estop a defendant from relitigating issues previously determined adversely to defendant in prior litigation. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979). In the Parklane case, the Supreme Court suggested that the application of offensive estoppel should not be permitted if it would be unfair. Id., 439 U.S. at 331, 99 S.Ct. at 651.

In this case, as indicated previously, it would be unwise to allow defendant, under the circumstances of this case, to undermine the policy and salutary purpose of the doctrine of collateral estoppel by permitting it to escape its application where it shirked its responsibility to exercise fully its right to participate in and to control prior litigation and where its actions precipitated the prior litigation and its personnel were of necessity primary and vital witnesses in such litigation. The State was merely an innocent conduit between the Service and the contractor—the true adversaries in the litigation. Application of the doctrine of collateral estoppel in this case would not, in the judgment of the court, be unfair to defendant. On the other hand, refusal to apply the doctrine in this case would be unfair to plaintiff. As indicated previously, plaintiff was an innocent buffer between the Service and the contractor. The State had nothing to do with the design and preparation of the plans and specifications which provoked the State litigation. Requiring the State to relitigate the matter puts it at a severe disadvantage. At time of trial of this case, the main and most important witness of the contractor, Thomas Sornsin, president of the contractor company, was deceased. At trial, not one employee or official of the contractor testified. The record does not indicate clearly the reason for this "stacked-deck." It most probably reflects a determination by plaintiff's counsel that collateral estoppel precluded such a redetermination of previously decided identical issues. Such a view, fostering reliance on judicial determination, comports with the policy which the doctrine of collateral seeks to achieve. It is also worth noting that plaintiff, after opposing the contractor in the State litigation, might have encountered difficulty in obtaining genuine assistance from the contractor. Why should a contractor who had successfully litigated a number of issues, go through another litigation on those same issues under circumstances where the contractor has nothing to lose but time and money. The defendant's position in this litigation is not deemed a fair one under all the circumstances. The special circumstances discussed above establish that application of estoppel in this case would be fair to plaintiff and would not be unfair to defendant.

It is concluded that defendant had a full and fair opportunity to litigate the issues relating to the inadequacy of its plans and specifications and the damages that flowed therefrom in the State courts of Montana. Accordingly, the United States, under the particular and unusual circumstances of the case, is estopped from seeking a contrary resolution of those issues in this court.

IV.

Having concluded that defendant is estopped to redetermine the issues of liability

and quantum, it follows, without more, that plaintiff is entitled to recover the other half of the judgment ($160,492.03) it was forced to pay the contractor because of the Service's defective plans and specifications.[14]

■ Defendant, however, insists that plaintiff has suffered no damages in any event. Defendant argues that the State court "judgment was in essence a judicially ordered upward equitable adjustment." Under the contract equitable adjustments are deemed construction costs, and were to be shared equally by the Service and the State. Defendant, therefore, viewing the judgment as an equitable adjustment maintains that since it has shared the payment of that judgment with plaintiff, plaintiff is not entitled to anything more. Thus, defendant argues, plaintiff has not suffered any damages since, had such claims been allowed by the contracting officer, defendant would only have been required to pay one-half of said costs. Defendant cites no authority, case law or otherwise, for the proposition that a judgment on a breach of contract claim can be deemed an equitable adjustment. Defendant ignores the difference between a breach claim and an equitable adjustment claim. See J.A. Terteling & Sons, Inc. v. United States, 182 Ct.Cl. 691, 694, 390 F.2d 926, 927 (Ct.Cl.1968). Moreover, the court is not concerned about what might have been, but is concerned about what did happen. The contractor sued for breach of contract damages. It did not sue for an equitable adjustment. There is no basis for labeling the judgment as a "judicially ordered equitable adjustment" so that defendant in this case can restrict its full liability for breach of its contract with the State to supply adequate plans and specifications. See Klein v. United States, 152 Ct.Cl. 8, 20, 285 F.2d 778, 784–85 (Ct.Cl. 1961).

V.

Plaintiff also seeks reimbursement from defendant for $31,852.22 in attorney's fees it incurred in defending against the contractor's action. Plaintiff's brief offers very little assistance on this point. The relevant portion of Clause E 5 provides that:

> * * * In no case will the Service [defendant] contribute additional funds for payment of attorney's fees.

■ Plaintiff asserts that, despite the clear message conveyed by these words, this portion of Clause E 5 is inapplicable to the instant case because it was not intended to cover the situation here where the government's breach caused the contractor's judgment. This argument is not persuasive. Indeed, the general rule is that attorney's fees may not be recovered against the United States as a part of damages for breach of contract, unless their allowance is specifically authorized by some statute. See L.L. Hall Constr. Co. v. United States, 177 Ct.Cl. 870, 888, 379 F.2d 559, 569 (Ct.Cl.1966). See also SCM Corp. v. United States, 211 Ct.Cl. 309 (1976). Plaintiff has not cited any statute or other authority which would support awarding it the attorney's fee expense it claims herein.

■ The Court of Claims, in its order of March 6, 1981, did not deal with this question since it was not an issue before the court. Thus, there is no law of the case doctrine precluding consideration by this court, in the first instance, of the meaning of this portion of Clause E 5. Indeed, this portion of the clause cannot be held to be ambiguous since there could not possibly be conflicting reasonable interpretations of the provision. The language is crystal clear: " * * * In no case * * * " will the defendant pay attorney's fees. The only reasonable interpretation of this explicit language is that, regardless of whose breach causes the contractor's judgment, the defendant

14. In view of this conclusion, it is not necessary to pass judgment on each issue on which defendant seeks a redetermination that the Service had not breached its obligations under the contract to furnish adequate plans and specifications and that the Service was not the cause of the plaintiff's judgment liability to the contractor. One of these issues, i.e., the erroneous riverbed elevations, on which defendant seeks a redetermination has been discussed previously and defendant's redetermination position has been shown to be legally without merit.

will not pay attorney's fees. Because the contractual language, in question, is clear on its face, plaintiff's claim for reimbursement of attorney's fees, in any event, must be denied.

## VI.

For reasons discussed above, plaintiff is entitled to recover, with judgment in the amount of $160,492.03 to be entered for plaintiff. Plaintiff is not entitled to recover as damages the expense of attorney's fees.